BAT-A-BALL, INC., Plaintiff-Appellee, v. THE CITY OF CHICAGO *et al.*, Defendants (Midland Warehouse *et al.*, Defendants-Appellants).

First District (1st Division)   No. 1—88—2269

Opinion filed May 8, 1989.

Richard F. Friedeman, Jr., of Halfpenny, Hahn, Roche & Marchese, of Chicago, for appellants.

Bernard I. Citron, of Schain, Firsel & Burney, Ltd., of Chicago, for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

This is an administrative review action. Defendants, Midland Warehouse and Midwest Folding Products, appeal from the reversal by the circuit court of an order entered by the Zoning Board of Appeals of the City of Chicago (ZBA) which denied the request by plaintiff, Bat-A-Ball, Inc., for a special use permit to allow an outdoor amusement facility comprised of automatic batting cages, video games and a go-cart track to be built in a manufacturing district zoned M2-4.

The sole issue on appeal is whether the circuit court erred in finding that the ZBA's decision was contrary to the manifest weight of the evidence. For the following reasons, we reverse the judgment of the circuit court.

The record sets forth the following facts pertinent to this appeal. Plaintiff owns vacant property located at the northwest corner of 15th Street and Western Avenue in Chicago. Directly to the south, across 15th Street, is the five-story brick Midland Warehouse Building, which provides leased space to small manufacturers. Defendant Midwest Folding Products is located to the north, along Western Avenue. To the west is a portion of the facilities of Inland Ryerson Steel, and to the east are the yard and trucking facility of Chicago and Northwestern Railroad. On September 16, 1987, pursuant to section 10.4—2 of the Chicago Zoning Ordinance (CZO) (Chicago Municipal Code ch. 194A, §10.4—2), plaintiff filed an application with the ZBA requesting a special use permit to establish an outdoor amusement facility at this location.

On December 11, 1987, a public hearing was held before the ZBA. At the hearing Michael Pelfresne, owner of Bat-A-Ball, Inc., testified that the facility would be open from mid-March to November, seven days per week, 8 a.m. until midnight. No food would be served. It was anticipated that the peak hours would be from 7 p.m. to 11 p.m. In addition to the batting cages, video games and go-cart track, there would be a parking lot which would accommodate 70 vehicles. The entire facility, including the parking lot, would be fenced and the facility would have a security system, but no security personnel. Pelfresne described the area as one having high traffic volume and no recreational facilities located nearby.

Pelfresne further stated that he owns similar facilities in Melrose Park and Tinley Park and testified that each attracted a cross-section of age groups and ethnic groups, and that he never had had any problems with fighting or complaints from surrounding property owners. In fact, he had never had to hire security personnel.

Anthony Miniscalco, president and design principal of Miniscalco Associates, architects and planners, testified on behalf of plaintiff that, in his opinion, the proposed use would not be harmful to the public health, welfare and safety of the area and would have no detrimental effect on the current manufacturing use of the surrounding area. Next, Terrence O'Brien, real estate appraiser, broker and consultant, testified on behalf of plaintiff that, in his opinion, the proposed use was harmonious with other uses in the area; would not create any extraordinary traffic; would not generate noise, odor or

fumes; would not result in loss of air or light to adjoining property owners; and conformed to the trend in the area, which was moving away from manufacturing to commercial.

In opposition to the proposed use, Steve Vertin, commercial operator and industrial real estate appraiser, stated that his basic objection to the amusement facility was that it would increase the crime rate in the area and decrease property values. Vertin based this conclusion on a detailed study which indicated, *inter alia*, that East Garfield Park, located one-quarter mile from the proposed site, has the highest juvenile delinquency rate in Chicago and that the proposed use would be directed to the under-20 age group.

Next, Tom McGinnes, attorney for defendant Midland, testified that Midland, which leases space to manufacturing tenants, has heavy truck traffic and he foresaw problems with traffic when Bat-A-Ball patrons would be trying to get in and out of the parking lot. As a result, McGinnes predicted that the building's tenants would suffer disruption in their pickups and deliveries and move their business elsewhere. McGinnes also expressed concern that Midland would have to hire additional security personnel and stated that police response time in that area was not very good. On cross-examination, McGinnes admitted that most of the deliveries to Midland are made during the day.

In addition to the testimony at the hearing, the record also contains the following letters which were written to the ZBA: (1) letter from Elizabeth Hollander, commissioner, department of planning, recommending that plaintiff's application for a special use permit for the amusement facility be approved; (2) letter from ward alderman, Juan Soliz, recommending that the permit be approved; (3) letter from the mayor of Melrose Park, stating that there have never been any problems with the Bat-A-Ball facility in his city; (4) letter from Steve Vertin, appraiser, detailing the reasons for his conclusion that the proposed use would have a substantial adverse effect on market values of surrounding properties; and (5) letter from Chicago and Northwestern Railroad stating that the amusement facility "would not be compatible with the public good and it would be detrimental to the interests of the established property owners."[1]

On December 23, 1987, the ZBA denied plaintiff's application on the following grounds:

---

[1]On plaintiff's motion, the letter from Chicago and Northwestern Railroad was stricken from the record on the grounds that it did not reach the ZBA until after its deliberation and entry of an order in this matter.

"[T]he proposed outdoor amusement facility would be incompatible with the surrounding manufacturing uses and is not necessary for the public convenience at this location; that the nature of the proposed use would attract mostly younger persons creating a potential for a gathering place which would pose a threat to the public health, safety and welfare of this manufacturing community; and that the establishment of an outdoor amusement facility on the subject site 2.8 acres would adversely affect the viability of the existing manufacturing uses in the area."

On administrative review, the circuit court reversed the ZBA's decision on the grounds that it was against the manifest weight of the evidence. The court specifically noted that in reaching its decision, the ZBA had apparently disregarded the alderman's letter, the letter from the department of planning, Pelfresne's testimony and Miniscalco's testimony. Defendants Midland Warehouse and Midwest Folding Products appealed the circuit court's decision. Neither the city nor the ZBA appealed.

■ In support of its position that the circuit court erred in finding that the ZBA's decision was contrary to the manifest weight of the evidence, defendants contend that plaintiff failed to provide sufficient evidence that the proposed use would comply with the requisite standards for the allowance of a special use permit set forth in section 11.10—4 of the CZO. Section 11.10—4 provides, in pertinent part:

"No special use shall be granted by the Zoning Board of Appeals unless the special use:

(1) a. Is necessary for the public convenience at that location.

b. Is so designed, located and proposed to be operated that the public health, safety and welfare will be protected; and

(2) Will not cause substantial injury to the value of other property in the neighborhood in which it is to be located; and

* * *

(4) Such special use shall conform to the applicable regulations of the district in which it is to be located." (Chicago Municipal Code ch. 194A, §11.10—4.)

Initially, we note that the language of section 11.10—4 is in the conjunctive. Therefore, it is the applicant's burden to prove that the proposed use meets all of the required standards. (*Racith Corp. v. Zoning Board of Appeals* (1981), 95 Ill. App. 3d 716, 420 N.E.2d 630.) Although there is no direct reference to section 11.10—4 in the ZBA's findings, the findings specifically address all of the section 11.10—4

requirements which provide the basis for the ZBA's denial of plaintiff's request.

■ It is well recognized that the ZBA is vested with broad powers in determining the suitability of a given site for a proposed special use. (*Racith Corp. v. Zoning Board of Appeals* (1981), 95 Ill. App. 3d 716, 420 N.E.2d 630.) On administrative review, the finding and conclusions made by the ZBA on questions of fact shall be held to be *prima facie* true and correct, and its decision will not be reversed unless it is against the manifest weight of the evidence. *Hope Deliverance Center, Inc. v. Zoning Board of Appeals* (1983), 116 Ill. App. 3d 868, 452 N.E.2d 630.

■ The first standard set forth in section 11.10—4 is that the proposed use must be "necessary for the public convenience at that location." The term "necessary," as it is used in section 11.10—4, has been regularly construed by the courts to mean "expedient" or "reasonably convenient" to the public welfare. (*Illinois Bell Telephone Co. v. Fox* (1949), 402 Ill. 617, 85 N.E.2d 43; *Hope Deliverance Center*, 116 Ill. App. 3d 868, 452 N.E.2d 630; *Foster & Kleiser, Division of Metromedia, Inc. v. Zoning Board of Appeals* (1976), 38 Ill. App. 3d 50, 347 N.E.2d 493.) In the present case, Michael Pelfresne, owner of Bat-A-Ball, Inc., testified that there are no recreational facilities nearby and that by building a landscaped recreational facility on the proposed site, which is currently a debris-strewn vacant lot, the lot would improve the area. Further, in a letter to the ZBA recommending that the facility be approved, Juan Soliz, 25th ward alderman, stated that, "Any additional recreational facility would only be a bonus to the many children in our 25th ward."

At the hearing, defendants did not dispute the lack of recreational facilities nearby. However, they argued that the very lack of other recreational facilities nearby combined with the area's large high school drop-out rate and high unemployment increased the potential for the subject property to be a gathering place for delinquent juveniles. Defendants argued that the potential for trouble was further exacerbated by the fact that East Garfield Park, an area with the highest juvenile delinquency crime rate in Chicago, was only one-quarter mile away.

Regarding the second standard set forth in section 11.10—4 that the proposed use be "designed, located and proposed to be operated [so] that the public health, safety and welfare will be protected," Pelfresne testified that the proposed facility would be landscaped, contain a parking lot, be completely enclosed by a fence, and have an installed security system. Pelfresne also testified that no food would

be served at the facility and that he had never had any complaints from property owners living near his other facilities.

Anthony Miniscalco, architect and planner, testified that the proposed use would not be harmful to the public health, welfare and safety and that it would have no detrimental effect on the surrounding area. Similarly, Terrence O'Brien, real estate appraiser and consultant, testified that the proposed use would not generate any extraordinary traffic, noise, odors or fumes.

In opposition to the use, Steve Vertin, real estate appraiser, reiterated the fact that the increased potential for crime due to the facility's proximity to high crime areas would adversely affect the health, safety and public welfare of the community.

In our view, Pelfresne's claim that there had been no trouble at his other Bat-A-Ball facilities is irrelevant to the present subject property because the demographics are strikingly different. Moreover, Pelfresne's emphasis on the fact that the peak hours of the facility would be from 7 p.m. to 11 p.m. is equally irrelevant. That statement is predicated on the peak hours at the other facilities, where teenagers are in school or are working. As discussed, those are not the conditions in the subject area. Thus, the potential for an all-day/all-night hangout is increased. During the summer months, the potential would be even greater. Although Pelfresne stated that patrons would not be allowed to loiter at the facility and that they would have to be paying customers, it is difficult to see how the facility would enforce these rules against individuals who routinely break the law. Further, we find the statements by plaintiff's experts that the facility would not harm the public welfare, health or safety to be mere unsupported conclusions. By contrast, as indicated in Vertin's letter to the ZBA, Vertin had studied several statistical reports to arrive at his conclusions that the proposed facility would increase the crime rate in the area and decrease property values.

The third standard set forth in section 11.10—4 requires that the proposed use "not cause substantial injury to the value of other property in the neighborhood in which it is to be located." Pelfresne's testimony regarding the fence and security system and lack of complaints also applies to this standard. In addition, the letter to the ZBA from the department of planning recommending the use also impliedly supports plaintiff's position that the property values would not be harmed. Further, Terrence O'Brien specifically stated that the facility would not be unsightly, noisy or result in loss of air or light to adjoining property owners and would not cause any substantial injury to the surrounding manufacturing companies.

Regarding evidence against the proposed use, defendants' argument regarding the potential for increased crime is relevant to this standard, including defendant Midland's contention that the potential for increased crime would result in loss of tenants in its building. We concur with the ZBA's decision that the appropriate emphasis is on the increased crime rate and the adverse effect on existing manufacturing uses in the area. Without question, these two factors would create a negative impact on the area's property values. Contrary to plaintiff's testimony, the concern is not the appearance of the facility, the loss of light or air, or noise.

The final standard set forth in section 11.10—4 requires that the special use "conform to the applicable regulations of the district in which it is to be located." Relying on section 10.4—2 of the CZO, which allows "Parks and Playgrounds" and "Outdoor Amusement Establishments" to be built in manufacturing districts, plaintiff contends that the CZO presumes a certain compatibility of the proposed use to the area. Further, Terrence O'Brien testified that, in his opinion, the facility was compatible to other uses in the surrounding area. O'Brien offered no statistical support for his conclusion. Similarly, the letter from the department of planning was merely a blanket approval with no explanation to support its conclusion. Accordingly, we find O'Brien's testimony and the department of planning's letter to be of little, if any, persuasive value.

In objecting to the proposed use, defendants stated that their businesses generated high truck traffic and that the amusement facility would interfere with their deliveries and pickups. As a result of this interference, tenants would move their businesses elsewhere. Although defendant Midland admitted on cross-examination that most of its pickups and deliveries were made during the day, this fact does not negate the facility's impact on the traffic problem because, as discussed, the facility is likely to be frequented during the day by the large number of high school dropouts and unemployed teenagers in the area who have no place else to go. Even if they cannot afford to pay for the amusements, they can loiter in the parking lot.

Accordingly, we find the evidence supports the ZBA's determination that plaintiff's proposed use: (1) would be incompatible with the surrounding manufacturing uses; (2) is unnecessary for public convenience; (3) would pose a threat to the public health, safety and welfare of the community; and (4) would adversely impact on the viability of existing manufacturing uses. In our view, the ZBA's findings clearly indicate that plaintiff has failed to satisfy the requirements of section 11.10—4 of the CZO. Therefore, we hold that the circuit court erred

in finding that the ZBA's denial of the special use was against the manifest weight of the evidence.

For the aforementioned reasons, the order of the circuit court reversing the decision of the ZBA is reversed.

Reversed.

BUCKLEY and QUINLAN, JJ., concur.