ROBERT LANCE WILSON, Plaintiff-Appellee, v. THE DEPARTMENT OF PROFESSIONAL REGULATION et al., Defendants-Appellants.

First District (2nd Division) No. 1—02—1342

Opinion filed November 18, 2003.

898

Lisa Madigan, Attorney General, of Chicago (Brian F. Barov, Assistant Attorney General, of counsel), for appellants.

F. Dean Armstrong, P.C., of Flossmoor, for appellee.

JUSTICE GARCIA delivered the opinion of the court:

In October 1998, the defendant, the Illinois Department of Professional Regulation (Department), filed an administrative complaint against the plaintiff, Robert Wilson, O.D., alleging (1) gross negligence (225 ILCS 60/22(A)(4) (West 1996)) (count I), and (2) dishonorable, unethical, and unprofessional conduct (225 ILCS 60/22(A)(5) (West 1996)) (count II). In November 1999, an administrative hearing was conducted. In March 2000, the administrative law judge (ALJ) recommended to the Department that Dr. Wilson's medical license be revoked for a period of five years. The Department implemented the ALJ's recommendation. In July 2000, Dr. Wilson filed his complaint for administrative review in the circuit court. In April 2002, the circuit court reversed and vacated the license revocation. We affirm in part, reverse in part the circuit court's rulings and remand to the Department for further proceedings.

## BACKGROUND[1]

In mid-September 1998, Dr. Wilson, a licensed doctor of osteopathy specializing in cardiology, acted as a consultant in the treatment of Henry Taylor. Taylor was suffering from superior vena cava syndrome, a blockage of the main chamber of the heart, due to end-stage renal disease.

In late September 1998, Dr. Wilson was summoned to Taylor's bedside as Taylor began to suffocate due to a pulmonary compression on his trachea, a complication of superior vena cava syndrome. Previously, Taylor had signed do-not-resuscitate and do-not-intubate orders. In an attempt to relieve Taylor's pain, Dr. Wilson injected Taylor with at least 10 milligrams of morphine through an intravenous (IV) line into Taylor's femoral artery (near the groin). Taylor continued experiencing pain. Dr. Wilson then injected 40 milliequivalent of

---

[1]Although Dr. Wilson asserts the Department "did not fairly summarize the facts," as pointed out by the Department, Dr. Wilson failed to (1) demonstrate how the Department's statement of facts violated Supreme Court Rule 341(e)(6) (188 Ill. 2d R. 341(e)(6)) or (2) supply a counterstatement of facts supported by citation to the record. Further, that section of Dr. Wilson's brief asserting that the Department's statement of facts is unfair is riddled with argument and cannot itself constitute an appropriate statement of facts as mandated by the rule. See 188 Ill. 2d Rs. 341(f), (e)(6); *Aboufariss v. City of De Kalb*, 305 Ill. App. 3d 1054, 1058, 713 N.E.2d 804 (1999) (statement of facts violating Rule 341(e)(6) (188 Ill. 2d R. 341(e)(6)) will not be considered). Therefore, Dr. Wilson's comments regarding the Department's statement of facts will be disregarded.

undiluted potassium chloride through the IV; Taylor died within one minute.

Later that day, Dr. Wilson reported his use of potassium chloride to Dr. Michael Settecase, the medical director of Olympia Field's Osteopathic Hospital (Hospital). Drs. Wilson and Settecase reported Taylor's death to the Cook County medical examiner's office (Medical Examiner). The Medical Examiner conducted Taylor's autopsy, which revealed the cause of death to be potassium chloride intoxication; the manner of death was ruled a homicide. The Olympia Field's police department initiated a criminal investigation into Taylor's death; however, the Cook County State's Attorney decided not to criminally prosecute Dr. Wilson.

In early October 1998, the director of the Department, Nikki Zollar (Department Director), temporarily suspended Dr. Wilson's medical and controlled substance licenses. The Department then filed an administrative complaint against Dr. Wilson seeking to have his license suspended or revoked because of his use of potassium chloride. The Department's complaint charged Dr. Wilson with gross negligence and dishonorable, unethical, and unprofessional misconduct. See 225 ILCS 60/22(A)(4), (A)(5) (West 1996). In mid-November 1999, the Department conducted a disciplinary hearing before ALJ Phillip Howe and several panel members.

## License Suspension Hearing, Day One

On the first day of the hearing, one of Dr. Wilson's attorneys, Mr. Zimmerman, made the following preliminary motions: (1) to dismiss the Department's proceedings, claiming they violated Dr. Wilson's due process rights; (2) to bar any mention of Taylor's autopsy report since Dr. Wilson had no opportunity to conduct an independent autopsy on Taylor's body; and (3) to have Dr. Wilson's expert testify out of order because of a scheduling conflict involving the expert. The ALJ denied Mr. Zimmerman's first two motions but granted the third.

Dr. Wilson's expert, Dr. Bruce Waller, a cardiologist and professor of cardiology, testified that the superior vena cava is the main chamber of the heart through which blood that has circulated throughout the body flows before being sent to the lungs to be oxygenated. After examining Taylor's premortem and postmortem X rays, Dr. Waller concluded Taylor's superior vena cava syndrome was the result of a blood clot totally obstructing the superior vena cava. The clot forced blood attempting to return to the heart to flow into adjacent blood vessels and soft tissue. The transposed blood caused edema (swelling), and as a result, Taylor's upper extremities (neck, arms, face, and eyes) became swollen. In Taylor's case, the accumulation of displaced fluid

intensified the swelling in his neck, causing his trachea to compress, thus preventing air from entering his lungs, and as a consequence, Taylor began to suffocate.

Dr. Waller testified that notes in the physician's file made it clear that although Taylor had signed a do-not-resuscitate order, his treating physician asked if he wanted to be intubated. Taylor declined and Dr. Wilson was called. Dr. Waller testified that as Taylor's breathing became distressed, he was given 2 milligrams of morphine by the resident physician, 10 milligrams of morphine by Dr. Wilson, and possibly another 10 milligrams of morphine by Dr. Wilson. Dr. Waller testified that according to the file, the dopamine drip, which helps elevate blood pressure, was turned off, and as a result, Taylor's eyes rolled back into his head and his respiratory rate diminished. Dr. Wilson then administered undiluted potassium chloride.

Dr. Waller opined that the undiluted potassium chloride could not have reached Taylor's heart before it stopped due to the arterial blockage and respiratory distress Taylor was experiencing. Dr. Waller based his conclusion on a Norwegian study in which 30 milliequivalent of diluted potassium chloride, gradually infused into the aortas of patients undergoing open-heart surgery, did not cause the patients' hearts to stop. On cross-examination, Dr. Waller admitted there was no blockage in the inferior vena cava, the path from the femoral artery (where the undiluted potassium chloride was introduced by Dr. Wilson) to the heart. However, Dr. Waller maintained Taylor died because of his underlying medical condition, and not because undiluted potassium chloride was administered.

Dr. Waller conceded potassium chloride is a dangerous and even lethal drug; however, he maintained that 40 milliequivalent was a reasonable amount to administer under the circumstances. On cross-examination Dr. Waller acknowledged he had never personally been present in a hospital setting where 40 milliequivalent of undiluted potassium chloride was administered to a patient. Dr. Waller testified that, generally, potassium chloride is diluted before being administered. Dr. Waller also testified that the American Medical Association's (AMA) ethical rules permit the use of potassium chloride for palliative care.[2]

At this point, the Department was unable to finish its cross-examination because of Dr. Waller's scheduling conflict. The following

---

[2] " 'Palliative care' means treatment to provide for the reduction or abatement of pain *** rather than treatment aimed at investigation and intervention for the purpose of cure or inappropriate prolongation of life." 210 ILCS 60/3(i) (West 1996).

dialogue ensued with the participants agreeing to recall Dr. Waller at a later date.

"MR. ZIMMERMAN: Your Honor, the witness needs to catch a plane, and as a matter of scheduling, I don't know how you want to handle that.

MR. GOLDBERG: Your Honor, may I suggest that the witness needs to get another plane. We need to finish our cross-examination if this witness's testimony is allowed to stand.

THE WITNESS: I am on call at five o'clock Indianapolis time.

[THE ALJ]: Folks, there are two possibilities.

MR. ZIMMERMAN: We can recall him.

[THE ALJ]: Folks, there are two possibilities. Either we continue today and recess and the doctor can reschedule whatever he has to do. From his previous statements and [the way] he's looking at me right now, I can tell he's thinking that's impossible, that's like moving the world, I can't do it.

The other possibility is that he comes back at another time. And the respondent got two hours and 45 minutes worth of time [for] direct exam[ination], and so therefore, the Department would get two hours and 45 minutes for cross-exam[ination]. It's now five after two, and my notes say we started the actual questioning at 1:23. So if we stop now, we [are] at 2:05, then we'll just have to schedule and have him come back later.

MR. ZIMMERMAN: Thank you, Your Honor.

[THE ALJ]: What says the Department?

MR. LYONS: I think that's a good plan.

* * *

[THE ALJ]: So, we are stopping at 2:11. Thank you, Doctor. We will reschedule you at another time. Do you have any time that's convenient for this month?

THE WITNESS: Yes, I'm sure this month. I just can't do it the next two days.

[THE ALJ]: Fine."

Following the testimony of Dr. Waller, the Department called Dr. Wilson as an adverse witness. Dr. Wilson admitted he administered 10 milligrams of morphine to Taylor and may have also given Taylor 10 more milligrams of morphine. Dr. Wilson administered the morphine through Taylor's femoral artery in order to quickly circulate it. In explaining his use of the femoral artery, Dr. Wilson explained, "[Taylor] was clotted up from above. That [morphine] would not circulate to the heart. If it can't get to the heart, it's not going to the brain." Dr. Wilson then conceded that morphine was used to relieve pain; however, Dr. Wilson concluded the morphine was not working fast enough to ease Taylor's pain and instructed a nurse to obtain

undiluted potassium chloride although (1) he had never personally used undiluted potassium chloride on a dying patient, and (2) he had never seen undiluted potassium chloride administered to a dying patient. Dr. Wilson believed administering potassium chloride was proper palliative care because it would render the patient unconscious and relieve pain.

Dr. Wilson believed Taylor died of asphyxiation because at the time he was administering the potassium chloride, Taylor's trachea collapsed and he was not getting enough oxygen. Dr. Wilson based his assertion that Taylor died of asphyxiation on his observations that (1) Taylor's airway had collapsed and he was at the point of dying when the potassium chloride was administered, and (2) Taylor was dead within one minute of the potassium chloride being administered.

## License Suspension Hearing, Day Two

Dr. Don Hollandsworth, a staff physician at the Hospital and Taylor's treating physician, testified for the Department that the use of morphine is ethically appropriate palliative care. Dr. Hollandsworth testified he would not use undiluted potassium chloride to relieve pain during the dying process.

Next, Dr. Settecase, the medical director of the Hospital, testified for the Department that he had never used undiluted potassium chloride or seen it used in the manner Dr. Wilson used it. Later a panel member asked Dr. Settecase the following question, "Doctor, if you know, is potassium chloride the drug that's used for lethal injection[?]" In response to the question, Dr. Settecase testified he believed that potassium chloride was used by the Illinois Department of Corrections for lethal injections. Dr. Wilson's attorneys objected to this line of questioning and Dr. Wilson yelled, "I am out of here!" Dr. Wilson's attorneys moved for a mistrial, their motion was denied, and they left the hearing room. The hearing was then recessed for lunch.

Although neither Dr. Wilson nor his attorneys returned to the hearing room after lunch, the Department continued to present evidence. Dr. Mark Siegler, an expert in clinical medical ethics, testified that potassium chloride was an extremely dangerous drug and if given in an undiluted form, could cause the heart to stop. Dr. Siegler testified:

> "[T]he idea of potassium being an extremely dangerous drug, extremely dangerous chemical, is well understood; and the fact that nobody, in my experience, has ever injected 40 milliequivalent of potassium directly into a human being, that I have ever witness[ed] or that I have ever done, makes me think that this is a drug that is understood to have the likelihood, given quickly enough and [in] a high enough dose as 40 milliequivalent injected as a bolus, to stop the heart."

Dr. Siegler also testified that the Norwegian medical study relied on by Dr. Waller is distinguishable from the facts surrounding Taylor's death because (1) the potassium chloride used in the Norwegian study was diluted, and in this case, Dr. Wilson administered undiluted potassium chloride; and (2) the potassium chloride used in the Norwegian study was gradually circulated through the patients' bodies; however, in Taylor's case, Dr. Wilson administered undiluted potassium chloride through an IV directly to the heart by way of the femoral artery. Dr. Siegler speculated the potassium chloride would have reached Taylor's heart within 30 seconds to 1 minute after it was administered. Dr. Siegler testified his estimation was corroborated by Dr. Wilson's own testimony regarding his observation that Taylor died within one minute of the potassium chloride being administered.

Dr. Siegler's testimony asserted morphine was effective for palliative care because it decreased hunger and pain, reduced respiration, and induced sleep. Dr. Siegler also stated that since potassium chloride is more likely than morphine to cause asystolia (heart stoppage) and death, it is not ethically acceptable under the AMA ethical rules governing palliative care. Dr. Siegler concluded in his testimony that Dr. Wilson's conduct was reckless, disregarded Taylor's well-being, and violated the ethical standards of the medical profession.

Emiliana Durante, the nurse attending Taylor, testified morphine was available in the critical care unit where Taylor was treated. However, potassium chloride was only available in the intensive care unit. Durante retrieved potassium chloride from the intensive care unit at Dr. Wilson's request. Further, although Durante had been a nurse since 1977, she had never seen potassium chloride administered in an undiluted form. With her testimony, the Department rested its case in chief.

## License Suspension Hearing, Day Three

On the third day of the license suspension hearing, Mr. Zimmerman appeared on behalf of Dr. Wilson. Dr. Wilson was not present. The ALJ told Mr. Zimmerman that the Department had rested and invited him to present more of his case. Instead, Mr. Zimmerman requested the Department's proceedings be stayed pending the outcome of Dr. Wilson's motion in the federal court to enjoin the Department's administrative proceedings. Mr. Zimmerman also informed the ALJ that his client would not participate in the administrative proceedings unless the federal court abstained from enjoining the hearing. The ALJ denied the motion because (1) numerous continuances had been granted to Dr. Wilson, (2) Dr. Wilson's disruptive conduct led to his voluntary absence from the hearing, and

(3) procedural mechanisms were available for reopening the case. Mr. Zimmerman then left the hearing room, the Department presented its closing argument, and the ALJ announced, "we will close the hearing."

The federal court refused to enjoin the administrative proceedings, and in late December 1999, Mr. Zimmerman sought to reopen proceedings in order to (1) continue Dr. Waller's cross-examination and (2) present redirect testimony of Dr. Waller because Mr. Zimmerman believed the Department had reintroduced a charge that Dr. Wilson engaged in euthanasia. The Department argued that only Dr. Waller's cross-examination was cut short and, thus, only the Department was prejudiced by the unfinished testimony. The ALJ agreed with the Department and Dr. Wilson's motion to reopen the proceedings was denied.

In March 2000, the ALJ issued his findings after considering the testimony, medical records, medical studies, and Taylor's autopsy report. The ALJ concluded that Dr. Wilson committed gross negligence and acted dishonorably and unprofessionally in injecting Taylor with potassium chloride. The ALJ found Dr. Siegler particularly credible and Dr. Waller unconvincing. Further, the ALJ found Dr. Wilson's testimony self-serving and not credible. The ALJ recommended Dr. Wilson's professional license be revoked for a minimum of five years and reinstatement be conditioned on (1) a finding of mental fitness and (2) completion of ethical education classes.

In April 2000, the Department's medical disciplinary board (Disciplinary Board) accepted the ALJ's recommendations. In June 2000, the Department's Director adopted the Disciplinary Board's findings.[3]

In July 2000, Dr. Wilson filed his complaint for administrative review in the circuit court, arguing: (1) the Department Director's decision was against the manifest weight of the evidence; (2) the ALJ had abused its discretion in refusing to reopen the proceedings to continue Dr. Waller's testimony; and (3) the ALJ committed reversible error in not barring Taylor's autopsy report.

In April 2002, the circuit court stated:

"In reviewing the standard in which I would look at this case, the question is whether I would follow the standard of administrative

---

[3]Although the Department's Director adopted the Disciplinary Board's findings, the Department's Director did not adopt the Disciplinary Board's recommendations for restoring Dr. Wilson's medical and controlled substance licenses pursuant to *Ala Albazzaz v. Department of Professional Regulation*, 314 Ill. App. 3d 97, 731 N.E.2d 787 (2000).

review which would state that if there is anything in the record to support the agency's decision, I was duty bound to affirm that decision, or if I would view this as [a] matter for *de novo* review. Given the natures, the issues in this case, the questions of law, whether there was a breach of due process procedures, [this] court believes that the review that it must utilize in this case is the *de novo* [standard of] review because there are questions of law that must be determined, rather than the lesser standard of if there is anything that manifests the evidence to support the agency's decision."

In reviewing the Department Director's decision *de novo,* the circuit court reversed and vacated the decision to revoke Dr. Wilson's medical license. The circuit court did not find the Department Director's revocation of Dr. Wilson's medical license against the manifest weight of the evidence; instead, the circuit court determined (1) the ALJ's denial of Dr. Wilson's request to bar the autopsy report was reversible error, and (2) the ALJ's refusal to reopen the proceedings and allow Dr. Wilson to recall Dr. Waller violated Dr. Wilson's right to due process. Regarding the autopsy report, the circuit court stated, "[Dr. Wilson] did ask that the evidence of the autopsy be barred because [Dr. Wilson] did not have an opportunity to review the body. I believe that was a proper motion, and that motion should have been granted. And I believe that, in addition to the denial of the expert witness, constituted reversible error."

## ANALYSIS

The parties have asked us to decide whether the ALJ abused his discretion when he (1) admitted Taylor's autopsy report into evidence and (2) refused to reopen the administrative hearing proceedings to allow Dr. Waller to be reexamined.

■ Generally, this court reviews the final decision of an administrative agency and not the decision of the circuit court. *Gounaris v. City of Chicago,* 321 Ill. App. 3d 487, 491, 747 N.E.2d 1025 (2001), quoting *Home Interiors & Gifts, Inc. v. Department of Revenue,* 318 Ill. App. 3d 205, 209, 741 N.E.2d 998 (2000). However, because the circuit court reversed the license revocation based on certain legal grounds, we begin our review of the Department Director's decision with the basis for the circuit court's reversal to determine whether its reversal is founded in law. See generally *Ikpoh v. Zollar,* 321 Ill. App. 3d 41, 746 N.E.2d 776 (2001) (circuit court upheld in part administrative agency's decision and remanded for further proceedings; on appeal circuit court order found not final and appealable). If so, we should affirm; if not, we may reverse.

## I. Taylor's Autopsy Report and Examination of Dr. Waller[4]

■ Agencies have broad discretion in conducting administrative hearings. *Sheehan v. Board of Fire & Police Commissioners*, 158 Ill. App. 3d 275, 286, 509 N.E.2d 467 (1987). However, "a license to practice medicine is a 'property right,' within the meaning of the constitutional guarantees of due process of law." *Smith v. Department of Registration & Education*, 412 Ill. 332, 340-41, 106 N.E.2d 722 (1952). Therefore, the basic due process rights of fairness and impartiality must be respected. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 92-93, 606 N.E.2d 1111 (1992).

■ The circuit court in this case found "a question of law" in the issues presented by this case as "whether there was a breach of due process procedures" in the ALJ's denial of Dr. Wilson's (1) motion *in limine* to exclude the autopsy report and (2) motion to reopen proceedings and recall Dr. Waller. The circuit court used a *de novo* standard of review in its analysis of the issues. In the context of appellate review of an administrative agency's decision, a *de novo* standard of review is limited to "interpretation of a statute." *Cole v. Department of Public Health*, 329 Ill. App. 3d 261, 264, 767 N.E.2d 909 (2002). Therefore, the circuit court's use of a *de novo* standard in this case was error. An administrative agency's decision regarding the conduct of its hearing and the introduction of evidence is properly governed by an abuse of discretion standard and subject to reversal only if there is demonstrable prejudice to the party. See *Bickham v. Selcke*, 216 Ill. App. 3d 453, 459-60, 576 N.E.2d 975 (1991).

### A. Taylor's Autopsy Report

The Department argues that the circuit court erred in finding reversible error in the ALJ's decision to allow the Medical Examiner's

---

[4]Dr. Wilson contends in his brief that "[t]here were numerous other grounds for reversal of the decision of the [Department] which support [the circuit court's] decision." Dr. Wilson has sought to "incorporate" these by reference to certain documents filed with the circuit court, rather than setting out the arguments *in toto*. We find this "reference" "to other grounds for reversal" to violate Supreme Court Rules 341(e)(7) and (f) (188 Ill. 2d Rs. 341(e)(7), (f)), the latter of which states that arguments "shall contain the contentions of the party *** with citation of the authorities and the pages of the record relied on" and "[p]oints not argued are waived." Because Dr. Wilson's "incorporated arguments" have not been briefed for this court, we find them forfeited. See generally *Fleming v. County of Kane*, 855 F.2d 496, 498 (7th Cir. 1988) (parties should not adopt briefs previously filed in support of motions at the district court level because it (1) results in a brief in excess of 50 pages and (2) confuses the issues presented).

autopsy report into evidence. Dr. Wilson argues the ALJ did err in admitting the results of Taylor's autopsy into evidence because Dr. Wilson was not able to conduct an autopsy independent of the Medical Examiner. The circuit court stated that, "while [Dr. Wilson] didn't subpoena the parties or ask to bring [the parties] in," Dr. Wilson's motion to bar the autopsy evidence was proper and should have been granted. We agree with the Department that the circuit court was incorrect as a matter of law.

■ Following Taylor's death, the Medical Examiner conducted an autopsy that revealed the cause of death as potassium chloride intoxication. Taylor's body was then released to his family. Dr. Wilson had no right to conduct an independent autopsy on the body of Taylor without the explicit permission of Taylor's next of kin. *Rekosh v. Parks*, 316 Ill. App. 3d 58, 68, 735 N.E.2d 765 (2000) (while there is no property right in a decedent's body, the next of kin have a right to the possession of a decedent's remains in order to make an appropriate disposition thereof). Therefore, permission to independently autopsy Taylor's body did not rest with the Medical Examiner or the Department; instead, permission could only be granted by Taylor's next of kin.

Although Dr. Wilson filed a motion *in limine* to bar the introduction of Taylor's autopsy report, Dr. Wilson never sought an independent autopsy. He is now seeking to use his inaction as a sword to strike down the Department's evidence. Moreover, no suggestion was made that the autopsy report was erroneous, faulty, or not reliable. Absent such a showing, there is no basis to exclude the report. The records of a Medical Examiner will be received as competent evidence in any criminal or civil action. See *Heitz v. Hogan*, 134 Ill. App. 3d 352, 357, 480 N.E.2d 185 (1985); 725 ILCS 5/115—5.1 (West 1996) ("In any civil or criminal action the records of the coroner's medical or laboratory examiner summarizing and detailing the performance of his or her official duties in performing medical examinations upon deceased persons *** shall be received as competent evidence in any court of this State"). Because Dr. Wilson never challenged any findings in the autopsy report, there was no basis to challenge the use of the Medical Examiner's death certificate as competent evidence. Therefore, the admission of the autopsy report in this case cannot be error.

Dr. Wilson urges us to follow the decisions of *People v. Newberry*, 265 Ill. App. 3d 688, 638 N.E.2d 1196 (1994), and *People v. Dodsworth*, 60 Ill. App. 3d 207, 376 N.E.2d 449 (1978); however, those cases are readily distinguishable. Both involved criminal defendants charged with controlled-substance-related offenses that sought to bolster their

defenses by testing substances the State identified as illegal. Dr. Wilson's reliance on criminal law standards regarding the destruction of evidence is misplaced. Although due process rights are present in both civil and criminal cases, even criminal due process, which affords greater protection, does not mandate "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance." *Arizona v. Youngblood*, 488 U.S. 51, 58, 102 L. Ed. 2d 281, 289, 109 S. Ct. 333, 337 (1988).

The admission of the Medical Examiner's autopsy report and denial of Dr. Wilson's motion *in limine* to exclude it were evidentiary issues. An administrative agency's decision regarding the admission of evidence is discretionary and should be reviewed as such. *Morelli v. Ward*, 315 Ill. App. 3d 492, 497, 734 N.E.2d 87 (2000). Our legislature has deemed the result of a Medical Examiner's inquest sufficient for evidentiary purposes. See 725 ILCS 5/115—5.1 (West 1996). Based on the presumptive admissibility of the autopsy report and the absence of any substantive challenge to the contents of the report, we reverse the circuit court and find that the ALJ's decision to allow the autopsy into evidence was not an abuse of discretion. *Morelli*, 315 Ill. App. 3d at 497.

### B. Motion to Reexamine Dr. Waller

■ The ALJ denied Dr. Wilson's motion to reopen the proceedings and recall Dr. Waller. The Department argues the ALJ did not abuse his discretion in refusing to give Dr. Wilson the opportunity to recall Dr. Waller because (1) Dr. Wilson refused to participate in the administrative proceedings, (2) Dr. Wilson was not diligent in preserving his rights, and (3) there was no prejudice. Dr. Wilson argues the ALJ's denial of his motion to reopen the proceedings violated his due process rights.

The circuit court found the ALJ's denial of Dr. Wilson's motion to reopen the proceedings and recall Dr. Waller was reversible error. Although the circuit court used an incorrect standard of review in its analysis of this issue, we find the ALJ did abuse his discretion in failing to grant Dr. Wilson's motion. See *Bickham*, 216 Ill. App. 3d at 459-60 (an administrative agency's decision regarding the conduct of a hearing is governed by an abuse of discretion standard).

Although we review the ALJ's denial of Dr. Wilson's motion to reopen with great deference (*People v. Coleman*, 183 Ill. 2d 366, 387, 701 N.E.2d 1063 (1998)), the revocation of a professional license carries with it dire consequences (*Smith*, 412 Ill. at 344). "In a proceeding so serious, due process of law requires a definite charge, adequate notice, and a full, fair and impartial hearing." *Smith*, 412 Ill. at 344.

Therefore, under the circumstances of this case, justice demanded Dr. Wilson be given a reasonable opportunity to recall his expert witness. *Lindeen v. Illinois State Police Merit Board*, 25 Ill. 2d 349, 352, 185 N.E.2d 206 (1962).

Even though Dr. Wilson did not aid his case by leaving the administrative hearing, his decision to walk out of the proceeding did not abridge his right to a full opportunity to present his case. Moreover, although the Department did not pursue its right to a complete cross-examination of Dr. Waller, Dr. Wilson's right to redirect his expert witness is independent of the State's decision whether or not to continue with its cross-examination. See *Six-Brothers King Drive Supermarket, Inc. v. Department of Revenue*, 192 Ill. App. 3d 976, 983-84, 549 N.E.2d 586 (1989) ("[b]asic notions of fair play require that parties have an opportunity to cross-examine, explain or refute facts which form the basis for an administrative agency's adjudication").

Dr. Waller's testimony ended in the midst of the Department's cross-examination. The ALJ, the Department, and Dr. Wilson's attorneys agreed Dr. Waller *would be recalled at a later date*. At the time of the agreement, Dr. Waller made it clear he was not available until *after* November 18, the third and final day of the hearing. Therefore, Dr. Waller could have returned to testify at the hearing as early as November 19. Such a short delay would have presented no prejudice to the Department but would have allowed Dr. Wilson a full opportunity to present his case, as justice requires.

"[D]espite the added expense and inconvenience rescheduling the hearing might have caused [the Department,] *** the reason[s] for the continuance [were] legitimate; granting it was required to meet the ends of justice." *Ullmen v. Department of Registration & Education*, 67 Ill. App. 3d 519, 523, 385 N.E.2d 58 (1978). In the first instance, Dr. Wilson was not able to testify until *after* November 18, the date Dr. Wilson was scheduled to continue with his defense. Further, because Dr. Wilson called Dr. Waller to testify at the beginning of the administrative hearing, Dr. Waller was unable to dispute the testimony of the Department's experts regarding whether or not undiluted potassium chloride was a proper palliative agent. Moreover, in its brief to this court the Department admits, "the question of ethics and professional responsibility in caring for dying patients was a matter for the experts: [Drs.] Waller and Siegler." Significantly, the ALJ found the testimony of the Department's expert, Dr. Siegler, more convincing than the testimony of Dr. Wilson's expert, Dr. Waller, although Dr. Waller's testimony was incomplete.

Although we agree that the ALJ was correct in not delaying the

Department's proceedings against Dr. Wilson while he pursued an action in federal court, there is a difference between holding proceedings in abeyance and limiting the evidence that may be presented for consideration. "A continuance required by the ends of justice should not be denied, and a refusal to grant such a continuance has been held to be an abuse of discretion warranting reversal." *Ullmen*, 67 Ill. App. 3d at 522, citing *Brown v. Air Pollution Control Board*, 37 Ill. 2d 450, 454-55, 377 N.E.2d 1297 (1967). An administrative agency possesses broad discretion in determining whether to allow a continuance. *Wegmann v. Department of Registration & Education*, 61 Ill. App. 3d 352, 357, 377 N.E.2d 1297 (1978). "Such discretion, however, 'must be exercised judiciously, and not arbitrarily' so as to satisfy the ends of justice." *Bickham*, 216 Ill. App. 3d at 459, quoting *Brown*, 37 Ill. 2d at 454. "Under the special circumstances of this case, it is our opinion that the ends of justice and due process would have been better served if [Dr. Wilson's] request [to reopen the proceedings] had been allowed." *Smith*, 412 Ill. at 343. Based on our review of the administrative hearing, we find that in considering Dr. Wilson's motion to reopen the proceedings so that he could present a complete defense by calling his expert witness in redirect and possible rebuttal to the State's expert, the ALJ abused his discretion in denying Dr. Wilson's motion.

Therefore, because it was an abuse of discretion to deny Dr. Wilson's motion to reopen the proceedings in order to recall his expert, Dr. Waller, the matter should have been remanded by the circuit court. See *Brown*, 37 Ill. 2d at 454-57 (ordering remand where agency erred in not granting a continuance); see also *Ullmen*, 67 Ill. App. 3d at 522-23.

## CONCLUSION

■ The judgment of the circuit court is affirmed as to its finding that the ALJ abused his discretion in denying Dr. Wilson's motion to reopen the proceedings, and reversed as to its finding that the ALJ abused his discretion in allowing the Medical Examiner's autopsy report into evidence. The circuit court's order vacating the license revocation is itself vacated and this matter is remanded to the Department with directions to allow Dr. Wilson a reasonable continuance to recall his expert witness.

Affirmed in part, reversed in part and remanded for further proceedings before the Department.

CAHILL and BURKE, JJ., concur.