2022 IL App (1st) 200884-U

THIRD DIVISION
March 23, 2022

No. 1-20-0884

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| TRI-TAYLOR COMMUNITY ASSOCIATION, ALDERMAN JASON ERVIN, GREGORY KIRSCH, DAYNA STINSON, DAVID BENES, ADELIA BENES, TONY HADDAD, and MIGUEL BAUTISTA, | ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs-Appellants, | ) ) ) | 19 CH 8631 |
| v. | ) ) | Honorable |
| THE ZONING BOARD OF APPEALS OF THE CITY OF CHICAGO and THORNTONS, INC. | ) ) ) | Sophia Hall Judge Presiding |
| Defendants-Appellees. | ) ) | |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Objectors were not denied due process by mid-hearing alterations to proposed special-use plans. Nor was Board's decision against manifest weight of evidence.

¶ 2    Plaintiffs, the alderman and several residents of the Tri-Taylor neighborhood, appeal the decision of the Zoning Board of Appeals to grant Thorntons, Inc. a special-use permit to build a gas station and convenience store on property situated between West Ogden Avenue, West 13th Street, and Oakley Avenue in the Tri-Taylor neighborhood.

¶ 3     At the hearing, the initial proposal faced significant push-back from the community and the Board itself. In the middle of the hearing, to alleviate some of the concerns, Thorntons amended the plans to remove two diesel pumps. After a recess, Thorntons presented its amended plan. Plaintiffs remained opposed. The Board ultimately approved the special use as modified.

¶ 4     Plaintiffs claim the mid-hearing amendment deprived them of procedural due process. They likewise claim that the Board's decision was manifest error. Sympathetic as we may be to plaintiffs' position, we find no basis for reversal and affirm.

¶ 5                                    BACKGROUND

¶ 6      The property described above (Property) is the former location of the Acme Barrel Company and contained significant environmental contamination, thus remaining vacant for decades. In 2015, Crossroad Ogden, LLC (Crossroad) purchased the site. Crossroad's president, Michael Nortman, explained that, since the purchase, Crossroad had spent nearly $4 million to complete "99.9%" of the mandatory EPA remediation.

¶ 7     The Property is a subdivision of a larger parcel of land purchased by Crossroad. The northern half of the full lot was recently sold for the construction of a McDonald's restaurant. The evidence before the board shows that Crossroad aggressively marketed the property for a use "more suited" to what plaintiffs wanted. Indeed, Thorntons's special-use submission indicated that more than 60 businesses refused the location. Thorntons was the only company that expressed interest in the site.

¶ 8     As the Property was classified C1-2, it is amenable to a gas station. But every gas station in Chicago requires a special-use permit, so Thorntons applied for one. The zoning administrator of the Chicago Department of Planning and Development recommended approval of the special-

use permit, and the application was referred to a hearing before the Zoning Board of Appeals. See Chicago Municipal Code § 17-13-0904.

¶ 9    At the hearing, Thorntons presented several witnesses: Drew Zazofsky, Thornton's senior manager of development; Michael Wolin, a certified general appraiser; Eric Tracy, a licensed engineer; Michael Nortman, the president of Crossroad; and Luay Abona, a traffic engineer.

¶ 10    Each of Thorntons's witnesses confirmed the truth of their affidavits in the submission packet. Beyond that, Zazofsky discussed Thorntons's history and ownership philosophy. He also pitched the benefits of the proposed gas station, convenience store, and landscaping.

¶ 11    Wolin discussed the character of the neighborhood and concluded that he "[did not] believe [the gas station] will have a negative impact on the surrounding area." Wolin also testified that the gas station met all applicable standards for special use. Abona testified about the expected traffic patterns and congestion from the additional gas station. Abona concluded that there would not be a significant impact on traffic, as most of the expected customers would come from "pass-by trips"—traffic that already exists in the area.

¶ 12    Alderman Ervin presented numerous concerns. Most notably, he said, was that he felt as if the community has been betrayed. Specifically, when Crossroad approached the neighborhood association, they "[o]riginally talked about having either a small grocer, an office use, something that did not generate nearly as much traffic as we would see here, and bring something of considerable value to the community." The "issue of a gas station only recently came up," he said, "because they could find nothing else to do" with the Property. The residents were surprised by the public notice that Crossroad planned to build a gas station on the Property.

¶ 13    The alderman discussed the history and impact of Acme Barrel Company's contamination of the Property in the past. That contamination, combined with the fact that the

residents of this community already live alongside a major intermodal facility, left the community residents "enduring [] environmental injustice for a number of years." With the gas station, they were concerned that they'd just be adding another major polluter. The residents agreed with this concern, he said, and emphasized a few of their own: increased truck traffic on their side roads, pollution from idling trucks, increased crime, lower property values, and the fact there were two other gas stations within a few blocks of the Property.

¶ 14    Throughout the alderman's statement, he and the Board exchanged questions and comments with Thorntons's witnesses. Nortman explained that Crossroad had approached "every operating grocery store in the city" and was turned down by each. In the sworn affidavit he confirmed, Nortman listed some 62 businesses—retailers, grocers, restaurants, banks, health facilities, daycare facilities, and salons—that he approached but who were unwilling to build on the Property; Thorntons had been his only taker.

¶ 15    Mr. Kirsch, the community association president, identified several concerns with the proposal, including that two gas stations already existed near that intersection, that he was concerned about the possibility of crime and loitering at a gas station, and that an increase in diesel traffic would make the area, already subject to a great deal of pollution due to its proximity to a major intermodal facility, even more polluted.

¶ 16    Members of the Board expressed concern with Thorntons's proposal. Commissioner Doar asked Kirsch if the association would reconsider its opposition if the station did not have diesel pumps. Kirsch responded that Thorntons had never considered altering its plan. But he stated that, as a community, "I think what we'd all like is a nice grocery store or maybe a nice drive-through coffee shop, or many of the million other retail uses that are needed in the community because it's a very underserved community. So rather than try to redesign their site

plan, we just don't want this."

¶ 17     Nortman then told the Board:

> "After discussing with Drew, the representative from Thorntons, I've been able to convince him to drop the diesel pumps. So he's willing to drop his diesel pumps.
>
> My understanding is, in talking with Mr. Lovanziano, that the City staff believes that they will be able to either eliminate or significantly restrict traffic on those residential streets.
>
> And it's something—it's something that I've been trying since I spoke with Greg Kirsch last week, at his suggestion—and he made the statement again today—it's something I've been trying to get Drew to agree to; but he just told me that he's willing to do that."

¶ 18     At this point, Chairman Parang told Thorntons that it needed new plans if it intended to make a change. Nortman explained that "the site planning would remain the same as far as what you see; but the rear of it, where you see the two pumps there, those will go away. And as the property owner, I'll offer [the empty space] to the Tri-Taylor Community Association for any use that they would like to use it for."

¶ 19     The Chairman broached the possibility of continuing the hearing to the next month, but Thorntons objected to a continuance. Plaintiffs, while mentioning that this amendment was not something they could "digest" on the fly, did not specifically request one. Alderman Ervin, in fact, stated that he did not think this amendment would affect plaintiffs' opposition.

¶ 20     After discussion, the Board recessed the hearing to allow Thorntons to draft its amendment and discuss it with the alderman and other residents attending the hearing.

¶ 21     When the hearing resumed, the Board accused Thorntons of having this plan in its "back pocket" and springing it on everyone, which Thortons's witnesses denied. The remainder of the hearing was spent discussing how the amended plans affected traffic, sales, and the like. Zazofsky clarified and reiterated that diesel would still be sold at the station. The amended plans simply removed the large diesel bay behind the store and the traffic exit onto 13th street. That area would now be designated an "open space" for landscaping or a garden.

¶ 22     Citing the reduced diesel traffic, the Chairman asked Alderman Ervin if his position had changed. The answer was a resounding no. The alderman was less than pleased with the notion of a green space behind a gas station. He testified that he would never let his daughter play there. He again emphasized that, because diesel would still be sold on the site, the communities' concerns remained. Ultimately, the community simply did not want a gas station at that location.

¶ 23     The assistant zoning administrator present told the Board that the Chicago Department of Planning and Development would recommend approval of the special-use permit as amended.

¶ 24     About two months after the hearing, the Board issued a unanimous decision granting the special-use permit. Plaintiffs filed a complaint for administrative review. The circuit court affirmed the Board's decision. This appeal followed.

¶ 25                                        ANALYSIS

¶ 26     Plaintiffs raise two arguments here: the Board's decision was against the manifest weight of the evidence, and they were denied procedural due process by the mid-hearing amendment.

¶ 27                                     I. Due Process

¶ 28     We begin with plaintiffs' claim that they were denied due process in the hearing. We review this claim *de novo*. *Engle v. Department of Financial & Professional Regulation*, 2018 IL App (1st) 162602, ¶ 43.

¶ 29　Due process is an " 'elusive concept' " that depends on the specific circumstances of a given case. *People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d 164, 184 (2002) (quoting *Hannah v. Larche*, 363 U.S. 420, 442 (1960)); see *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 92 (1992) ("due process is a flexible concept and requires only such procedural protections as fundamental principles of justice and the particular situation demand.")

¶ 30　Before an administrative agency, due process includes "the opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling upon the evidence." *Abrahamson*, 153 Ill. 2d at 95. There is no challenge here to the Board's impartiality.

¶ 31　The right to be heard simply means that the party has an opportunity to present its position to the Board. See *American National Bank and Trust Co. v. City of Chicago*, 209 Ill. App. 3d 96, 114 (1990). The record here shows that plaintiffs were given the opportunity to express their position and to question other witnesses. The alderman and other members of the community passionately and eloquently expressed their concerns and put relevant questions to the witnesses called by Thorntons. No witness was denied the right to speak or to give whatever input they wanted. Indeed, the mid-hearing amendment was made in direct response to the very concerns raised at the hearing—by both the community members and the Board—over diesel-fuel sales, in particular, and associated traffic congestion.

¶ 32　Plaintiffs argue, however, that the mid-hearing amendment to Thorntons's plans deprived them of a "meaningful opportunity" to review the amended proposal. Due process, they say, required a continuance.

¶ 33　Sympathetic though we may be to plaintiffs' position, we find no basis for reversal on this ground. Administrative boards and agencies have "broad discretion" in deciding whether to

7

grant a continuance. *Wilson v. Department of Professional Regulation*, 344 Ill. App. 3d 897, 911 (2003); see *Wegmann v. Department of Registration & Education*, 61 Ill. App. 3d 352, 357 (1978)). An agency abuses that discretion if denying a continuance deprives a party of the opportunity to present its position (*Wilson*, 344 Ill. App. 3d at 911), but that was not the case here.

¶ 34    Indeed, the Board chairman raised the notion of a continuance so that plaintiffs would have the time to review any new proposal. Thorntons, for its part, objected. But plaintiffs did not request a continuance. They repeatedly made it clear, in fact, that they would oppose the amended proposal, even with a reduced diesel presence on the property, for the same reason they opposed the original plan—they did not want a gas station built on the Property, period.

¶ 35    Even still, the Board recessed, giving time for Thorntons to put together its minor amendment and to discuss it with the members of the community present. The members, including the alderman, reiterated that, while they certainly preferred less diesel-fuel sales than more at that location, their objections remained to building a gas station on that Property, regardless of the presence or absence of diesel sales.

¶ 36    We are not being critical of plaintiffs' position at the hearing; far from it. But neither can we find a constitutional violation in failing to continue the proceedings to another date, when plaintiffs did not specifically request a continuance, when plaintiffs had an opportunity to review the amended proposal and, most importantly, when we can discern no prejudice to the lack of a continuance, given that plaintiffs made it clear that their position would not change regardless of the amount of diesel-fuel pumps at the site. See *Engle*, 2018 IL App (1st) 162602, ¶ 43 (due process violation cannot lie absent showing that plaintiff suffered prejudice from complained-of act).

¶ 37    In the end, though plaintiffs were obviously disappointed with the result, we cannot say they were denied a meaningful opportunity to be heard. We find no violation of procedural due process.

¶ 38                                   II. Manifest Error

¶ 39    Plaintiffs next claim that the Board erred in granting the special-use permit. On administrative review, we review the Board's decision, not that of the circuit court. *City of Chicago v. Sommerfeld*, 2020 IL App (1st) 180855, ¶ 49.

¶ 40    We presume administrative decisions are correct and will reverse them only if they are against the manifest weight of the evidence. *Kimball Dawson, LLC v. City of Chicago Department of Zoning*, 369 Ill. App. 3d 780, 786 (2006). A decision is against the manifest weight if "all reasonable people would find that the opposite conclusion is clearly apparent." *Id.* It is not our place to re-weigh the evidence or question the judgment of the administrative agency. *Id.*; see *Abrahamson*, 153 Ill. 2d at 88; *Glaser v. City of Chicago,* 2018 IL App (1st) 171987, ¶ 20.

¶ 41    This deferential standard of review recognizes that we are judges, not super-administrators who are free to second-guess boards, commissions, and agencies. We are not allowed to overturn an agency judgment simply because we might have reached a different outcome or because we do not like the result. *Abrahamson*, 153 Ill. 2d at 88. Our role is limited to determining "if the record contains evidence to support the agency's decision," and if so, the agency's decision "should be affirmed." *Id.*; *Glaser,* 2018 IL App (1st) 171987, ¶ 20.

¶ 42    Here, the Board was tasked with deciding whether Thornton's proposed gas station and accessory retail store qualified for a special-use permit. The Chicago Zoning Ordinance requires that the proposed use meet the following criteria:

"1.   complies with all applicable standards of this Zoning Ordinance;

2.   *is in the interest of the public convenience* and will not have a significant adverse impact on the general welfare of the neighborhood or community;

3.   is compatible with the character of the surrounding area in terms of site planning and building scale and project design;

 4.   is compatible with the character of the surrounding area in terms of operating characteristics, such as hours of operation, outdoor lighting, noise, and traffic generation; and

5.   is designed to promote pedestrian safety and comfort." (Emphasis added.) Chicago Municipal Code § 17-13-0905-A.

¶ 43   Plaintiffs focus exclusively on the second factor's requirement that the special use be "in the interest of the public convenience." *Id*. Plaintiffs rely on two cases for this point: *Bat-A-Ball, Inc. v. City of Chicago*, 184 Ill. App. 3d 776 (1989), and *Scadron v. Zoning Board of Appeals of City of Chicago*, 264 Ill. App. 3d 946 (1994).

¶ 44   Thorntons notes, however, that these cases are of limited assistance, as they construed an earlier version of the special-use ordinance, before its amendment to its current form in August 2004. In the cases cited above, the relevant provision required that the special use be "necessary for the public convenience at that location." *Scadron*, 264 Ill. App. 3d at 949 (quoting Chicago Municipal Code, ch. 194A, par. 11.10-4).

¶ 45   We are unaware of any legislative history, by way of floor debate or otherwise, explaining the change in language, and we have been cited none. Nor have we been cited any published decisions construing this amended language, and we have found none.

¶ 46     But it is hard to deny a qualitative difference between requiring, currently, that the special

use be "in the interest of the public convenience," as opposed to previously requiring that the

special use be "*necessary* for the public convenience *at that location*." The earlier language was

obviously more demanding, including the word "necessary" and fixing the point of public

convenience "at that location." The current ordinance is both less demanding and less specific.

That is not a factor we can ignore.

¶ 47     And even the previous, more demanding phrase "necessary for the public convenience"

was interpreted liberally, not literally, as one of the cases cited by plaintiffs indicates:

> "This phrase has been construed to mean expedient or reasonably convenient to the
>
> public welfare. [Citations.] A use does not necessarily meet this standard, however,
>
> merely because it is a legitimate use or one which is commercially expedient to the
>
> applicant. [Citation.] Instead, the applicant must demonstrate that the community will
>
> derive at least some benefit from the proposed use. [Citations.] Finally, it is essential that
>
> a special use be compatible with the surrounding area." *Scadron*, 264 Ill. App. 3d at 950.

See also *Illinois Bell Telephone Co. v. Fox*, 402 Ill. 617, 631 (1949) (interpreting same phrase in

predecessor version of Chicago zoning ordinance as meaning " 'expedient' or reasonably

convenient.' " (quoting *Brooks v. Chicago, Wilmington & Vermilion Coal Co.*, 234 Ill. 372, 379

(1908))).

¶ 48     These two cases cited by plaintiffs are of limited assistance in another sense, as well. In

each of those cases, the zoning board *denied* a special-use permit, finding that the special use

was *not* necessary for the public convenience at that location. See *Bat-A-Ball*, 184 Ill. App. 3d at

779; *Scadron*, 264 Ill. App. 3d at 949. Employing the manifest-weight standard of review, then,

the courts in those cases merely had to determine whether any evidence in the record supported

the board's *negative* finding, each time finding such evidence. See *Bat-A-Ball*, 184 Ill. App. 3d at 782-83; *Scadron*, 264 Ill. App. 3d at 950-51.

¶ 49    Here, even under the more demanding standard plaintiffs favor, the record contains evidence that building a gas station on the Property would be "reasonably convenient to the public welfare," and that "the community will derive at least some benefit from the proposed use." *Scadron*, 264 Ill. App. 3d at 950. In its written decision regarding the second factor contained in the zoning ordinance, the Board found that:

"The proposed special use in [*sic*] in the interest of the public convenience because it will allow a new gas station with a modern 4400 square foot convenience store, ample parking and ample drive aisle clearances to be built on a vacant piece of property. Further, the proposed special use will not have a significant adverse impact on the general welfare of the neighborhood or community as shown by the testimony of Mr. Zazofsky, the testimony of and report by Mr. Wolin, and the testimony of and report by Mr. Abona. For instance, because the proposed special use will be well-operated, it will not diminish property values in the area. In additional [*sic*], because the proposed special use is well-designed, it will not negatively impact traffic in the area."

¶ 50    Thorntons, for its part, emphasized the importance of the convenience store attached to the gas station. Drew Zazofsky, again Thorntons' director of development for the project, testified that

"You know, the convenience store industry has been moving in a different direction as of late and putting a lot more focus on the C-store itself.

For this reason, we made the decision a number of years ago to rethink how the stores look and feel inside.

We have a gourmet coffee bar, we have a fresh food offering, and we've designed an upscale kitchen inside the footprint of the store to offer breakfast and lunch to that crowd prepared on site by our food service technicians.

We have food service managers in charge of these specialized areas. This is a complicated supply chain. We are continuing to improve in that area.

We're designed to be a place you can stop on your way to work and grab coffee and also on your way home and grab milk or other perishables to serve the interim need between grocery store visits."

¶ 51    Plaintiffs emphasize that the only witnesses testifying in favor of the gas station and convenience store were self-interested landowners or employees or agents of Thorntons. Every member of the community, they note, either via live testimony or by written correspondence, testified that they did not want another gas station built in that area. They wanted, instead, a more upscale restaurant or café, if not a grocery store or something of that nature.

¶ 52    It is undoubtedly true that the community lined up in opposition to this permit application. And we are more than sympathetic with members of an underserved community wanting better food options and more attractive, upscale establishments to revitalize their neighborhood.

¶ 53    As we have emphasized, however, our role as a reviewing court is a narrow and modest one. The question before us is not whether we would have granted this permit application, or whether the Board properly weighed the competing evidence. Our question is simply whether "the record contains evidence to support the agency's decision." *Abrahamson*, 153 Ill. 2d at 88; *Glaser,* 2018 IL App (1st) 171987, ¶ 20 (quoting *Abrahamson*). There is no question that it did, as delineated above. So we affirm the Board's decision. *Id.*

¶ 54                                        CONCLUSION

¶ 55    The judgment of the circuit court, affirming the final decision of the Board, is affirmed.

¶ 56    Affirmed.