FOURTH DIVISION
FILED: December 21, 2006

1-05-3561

|  |  |  |
|---|---|---|
| | ) | |
| KIMBALL DAWSON, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | Nos.   04 CH 3470, 04 CH 3472, |
| | ) | 04 CH 3473, 04 CH 3474 |
| THE CITY OF CHICAGO DEPARTMENT OF | ) | |
| ZONING, and CITY OF CHICAGO ZONING | ) | |
| BOARD OF APPEALS, | ) | Honorable Sophia Hall, |
| | ) | Judge Presiding. |
| Defendants-Appellees. | ) | |
| | ) | |

JUSTICE MURPHY delivered the opinion of the court:

Plaintiff Kimball Dawson, LLC, filed a complaint in administrative review, appealing the

decision of defendant City of Chicago Zoning Board of Appeals' (Board) denial of its request for

a zoning variance.  Plaintiff claimed that the Board was biased and its decision was against the

manifest weight of the evidence.  The trial court affirmed the findings of the Board.  Plaintiff

appeals that decision, alleging again that the Board exhibited a bias against plaintiff and that its

decision was arbitrary and capricious.  For the following reasons, we affirm the trial court.

I.  BACKGROUND

The property in question, 2815-2829 North Dawson Avenue in Chicago, Illinois, is a

triangle-shaped parcel located at the intersection of North Dawson Avenue and North Kimball

Avenue.  In 2001, the property in question was redesignated from a B (business) zoning

designation to an R5 (residential) zoning designation. In 2002, plaintiff purchased the property for $1.5 million. Plaintiff planned to build four, three-story multiresidential buildings on the property. Two of the planned buildings were to have 12 condominium units and the second two buildings were to be of 8 and 9 units. In total, plaintiff planned for 41 condominium units with one parking space for each unit.

The record is unclear as to the exact date, but at some point in 2003, construction began on the property. The work began without building permits or variances for reductions in the front and side yard requirements for R5 zoned properties. At some date, again uncertain from the record, plaintiff applied to the City of Chicago Department of Zoning for variances for all four buildings. Generally, plaintiff requested reduction or elimination of certain yard size and setback requirements and the elimination of the loading berth for one building.

On August 19-21, 2003, the zoning administrator for the City of Chicago Department of Zoning denied plaintiff's zoning variance requests. Plaintiff filed an appeal of the variance denials with the Board on August 22, 2003. On October 24, 2003, the Board held a hearing on plaintiff's appeal.

Joseph Spingola, chairman of the Zoning Board of Appeals, presided over the hearing. Spingola opened the hearing by having plaintiff's counsel introduce himself and then discussed the sign-in sheets and witness list with counsel. Spingola noted that 12 people had signed in supporting the development and asked counsel whether he expected all 12 to testify. Plaintiff's counsel responded that he would present only two witnesses, plaintiff's managing member Jeff Dietrich and Louis Martinez, a licensed architect who designed the project.

1-05-3561

Plaintiff first presented the testimony of Dietrich. Dietrich testified that the site currently contains the partial development of two of the four proposed buildings for the development. Dietrich described the proposed development and the requested variances that were denied and on appeal. He noted that the triangular shape of the property and the presence of a subway ventilation grill presented obstacles in developing the property.

Of the proposed 41 condominium units, plaintiff included 12 handicap accessible units with wheelchair lifts and also planned to participate in the City of Chicago's affordable housing program. Dietrich also testified to the financial aspects of the proposed development. Plaintiff purchased the property for $1.5 million and anticipated development costs of $5.5 million. The anticipated sale price for the units ranged from $190,000 to $269,000, for a return of 8% to 12%.

Martinez testified to the difficulties in developing the property due to its triangular shape and the presence of the ventilation shaft. Martinez explained that the philosophy behind the four building proposals was to create a design in character with the community. He noted that a single building on the property, with more units than he had proposed, could fit without any variance required. However, Martinez opined that such a building would be out of character for the neighborhood and that his design, with minimal variations, better fit the residential character of the area.

Finally, Martinez responded, without any elaboration, that the proposed development would not: be detrimental to the public welfare or injurious to other property; impair an adequate supply of air and light to adjacent properties; increase the danger of fire or endanger public safety; substantially increase traffic congestion in the area; diminish or impair property values in the

3

neighborhood; or alter the essential character of the locality. At this point, plaintiff's counsel rested.

Upon cross-examination, Martinez was asked how he had determined that there would be no effect on the value of adjoining properties. Martinez responded:

"If we do an appraisal at the present time on the present property, and assuming that the property is built, we will find that more likely by the comments of what actually happens when this land is developed and primarily it just goes up. We raise the property tax prices in the area.

Right now at the present time with this property undeveloped, whatever the values are there, that's what they are but by developing this property, it will increase the property value in the surrounding area."

Martinez admitted that he had not conducted any studies in support of this belief. Plaintiff did not cite to any additional authority for Martinez's testimony.

Spingola then queried who would speak first in opposition to the requested variance. Alderman Colon responded that he would speak first, but Spingola stated that Colon should go last. Spingola continued:

"You're the real expert. What you have to do is you have to tie all of this together for us. Both the good and the bad. Do you consider sixty-six percent a landslide victory? I always did. That means a third of the people can't stand me. A landslide victory leaves a third of the people who bothered to vote saying we don't want this. So there's good and bad to everything so I saved it for last so you

1-05-3561

can fight altogether. Who's going to talk?"

At that point, William James, a principal and urban planning consultant with Camiros, Ltd., presented testimony on behalf of the objectors.

James submitted a copy of his resume to the Board and discussed his qualifications. James' resume indicates that he received a degree in landscape architecture and had been an urban planning consultant for over 25 years. He testified that he concentrates his work on urban planning, redevelopment and land use and zoning issues. James added that he has been the principal author of several zoning ordinances.

James also submitted a "site planning study," which he had created as an alternative to plaintiff's proposed development. James' study consisted of sketches of the "site plan" and "parking level plan" for his proposed building with data including 36 planned units, 41 planned parking spots, and various area square footage calculations for the building. Following a discussion of his "site planning study" and how his proposed project fits within the parameters of the zoning classification, James spoke to plaintiff's request for a variance and the standards required by ordinance to receive a variance.

James opined that his alternative design was proof positive that plaintiff could earn a reasonable return without requiring a variance. Even if his design would not produce a reasonable return, James alleged that any hardship was plaintiff's own doing for failing to exercise due diligence when purchasing the property. James next offered that there are numerous sites within the City of Chicago similarly situated to the property in question such that it was not a purely unique property. Further, James claimed that he had not heard any testimony to show that the

5

purpose of the variation was not based exclusively on a desire to make more money. Finally, James argued that plaintiff's design would impair an adequate supply of air and light to the adjacent property and increase traffic congestion.

On cross-examination, James admitted that his alternative building design was not a complete design and that he could not speak to every variance factor for his alternative like he did for plaintiff's proposal. Spingola also posed some follow-up questions to James to clarify his understanding. After James indicated that he felt plaintiff had not proven any standard, Spingola responded "[t]hat's two of us. I understand your testimony correctly."

Stan Kaderbeck, first deputy commissioner with the City of Chicago Department of Buildings, testified next. Kaderbeck testified that it was his understanding that work had begun on the property without any permits. Further, Kaderbeck had visited the site and opined that since the work that had been completed had been left in the open, significant work would be needed to rehab the buildings to bring them into code compliance. Plaintiff's counsel objected to Kaderbeck's testimony for relevance, and Spingola responded, "We're the Zoning Board. We're not the Building Department. We denied your application. The building has to be torn down. It will solve everybody's problem." Commissioner McCabe-Miele followed up by noting the Board occasionally encounters these situations and attempts to approach appeals as if nothing had been built, though they cannot always hope that the building department takes care of the issue.

Bruce Anderson and Jane Heron, residents of the neighborhood of the proposed project, both testified as objectors. Anderson opined that the proposed buildings were too large and too closely set to be consistent with the neighborhood and that this also would not supply adequate

light and air or allow proper access for firefighters. Heron testified that she had lived in the neighborhood for 25 years. Heron claimed that the community wanted to maintain a "leafy green village[-]like atmosphere" and the proposed project was too large and would create too much congestion. Heron concluded that she feared that the community has not been presented with all the information on the project and plaintiff should not now be rewarded for breaking the law and building before obtaining permits or variances.

Finally, Alderman Colon testified that he was not an expert on variances, but was there to help provide a "bigger picture view" in representing the interests and needs of the residents in his community. The alderman discussed the 2001 zoning change to an R5 designation and the community's response to the proposed plan on that date. He believed that the design was different from plaintiff's proposal, but it also involved four buildings. Counsel for plaintiff then offered documents into evidence to show the 2001 proposed development similarly detailed four buildings.

Following closing remarks from plaintiff's counsel and a show of hands from supporters of the proposal that were in attendance, the hearing was concluded. On January 23, 2004, the Board unanimously denied plaintiff's appeals. The Board's orders denying the variance requests stated: that no evidence was presented to indicate that plaintiff could not yield a reasonable return without the variance; that no unique circumstances existed; and that plaintiff's plight was self-created. Plaintiff filed a complaint sounding in administrative review in the circuit court. The trial court affirmed the decision of the board without elaboration. Plaintiff now appeals the trial court's decision.

7

## II. ANALYSIS

Plaintiff asserts two issues on appeal. First, plaintiff argues that the trial court erred in affirming the Board's decision as it was contrary to the evidence presented. Second, plaintiff claims that the Board chairman exhibited a bias that tainted the proceedings and prejudiced plaintiff.

In an action under the Administrative Review Law, factual determinations by an administrative agency are held to be *prima facie* true and correct and will stand unless contrary to the manifest weight of the evidence. 735 ILCS 5/3-110 (West 2004); *Amigo's Inn, Inc. v. License Appeal Comm'n*, 354 Ill. App. 3d 959, 964 (2004). To find a determination against the manifest weight of the evidence requires a finding that all reasonable people would find that the opposite conclusion is clearly apparent. *North Avenue Properties, L.L.C. v. Zoning Board of Appeals*, 312 Ill. App. 3d 182, 184 (2000). We review the decision of the Board, not the circuit court, as the hearing officer is the fact finder responsible for overseeing testimony, making credibility determinations and assigning weight to statements made by witnesses. *Ahmad v. Board of Education*, 365 Ill. App. 3d 155, 162 (2006). In making this determination, we do not weigh the evidence or substitute our judgment for that of the administrative agency. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). Simply put, if there is evidence of record that supports the agency's determination, it must be affirmed. *Abrahamson*, 153 Ill. 2d at 88.

Plaintiff argues that the Board made no findings of fact and only conclusions of law. Plaintiff also argues that the Board's orders merely parrot the language of the ordinance and do

8

not provide a rationale for denying plaintiff's variance requests. Further, no specific credibility determinations were made by the Board anywhere in its four orders. Therefore, plaintiff asserts, we must review the issue *de novo*, not under the more deferential manifest weight of the evidence standard, to determine if the action of the agency was arbitrary and capricious. *Obasi v. Illinois Department of Professional Regulation*, 266 Ill. App. 3d 693 (1994).

It is true that an agency's conclusions of law are not afforded such deference as those of fact. *North Avenue Properties, L.L.C.*, 312 Ill. App. 3d at 185. However, after this assertion, plaintiff proceeds to argue that the facts proved at the hearing support its position and, therefore, the agency's determination should not be afforded deference. For authority, plaintiff also misapplies the holding in *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 268 Ill. App. 3d 471, 481 (1994), a case brought under the Illinois Administrative Procedure Act (5 ILCS 100/1-1 *et seq.* (West 2004)), not the Illinois Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2004)).

Unless a statute requires specific factual findings, an administrative agency is only required to provide a record and findings to permit orderly and efficient judicial review. *Board of Education of Park Forest Heights School District No. 163 v. State Teacher Certification Board*, 363 Ill. App. 3d 433, 442 (2006). If the testimony at the administrative hearing is preserved in the record, as in this case, a reviewing court has sufficient grounds to examine an agency determination and specific fact findings are not required. *Board of Education*, 363 Ill. App. 3d at 442. Accordingly, the limited fact findings of the Board do not alter the standard of review and we review the Board's decision to determine if it was against the manifest weight of the evidence.

1-05-3561

We may rely on any basis appearing in the record to affirm an agency's decision. *Ahmad*, 365 Ill. App. 3d 155 at 162.

A.  The Manifest Weight of the Evidence

A zoning variance may be granted to a petitioner if strict compliance with the zoning ordinance would create particular hardship on a petitioner.  At the time of the administrative hearing in this case, the ordinance governing zoning variances read, in pertinent part:

"The Board of Appeals shall not vary the regulations of this comprehensive amendment, as authorized in section 11.7-4 hereof unless it shall make findings based upon the evidence presented to in each specific case that:

A.  The property in question cannot yield a reasonable return if permitted to be used only under the conditions allowed by the regulations in the district in which it is located;

B.  The plight of the owner is due to unique circumstances; and

C.  The variation, if granted, will not alter the essential character of the locality.

For the purpose of implementing the above rules, the Board shall also, in making its determination whether there are particular difficulties or particular hardships, take into consideration the extent to which the following facts favorable to the applicant have been established by the evidence.

(1) The particular physical surroundings, shape or topographical condition of the specific property involved would result in a particular hardship upon the

10

owner as distinguished from a mere inconvenience, if the strict letter of the regulations were carried out;

(2) The conditions upon which the petiton for a variation is based would not be applicable, generally, to other property within the same zoning classification;

(3) The purpose of the variation is not based exclusively upon a desire to make more money out of the property;

(4) The alleged difficulty or hardship has not been created by any person presently having an interest in the property;

(5) The granting of the variation will not be detrimental to the public welfare or injurious to other property or improvements in the neighborhood in which the property is located; and

(6) The proposed variations will not impair an adequate supply of light and air to adjacent property, or substantially increase the congestion in the public streets, or increase the danger of fire, or endanger the public safety, or substantially diminish or impair property values within the neighborhood."

***

Chicago Municipal Code §17--11.7--3 (1999) (subsequently revised and recodified in substantially similar form at Chicago Municipal Code §17--13--1107--B & 17--13--1107--C (2004)).

Accordingly, by the plain language of the zoning ordinance, a petitioner must prove all three of the first factors (A through C): the property cannot yield a reasonable return without a

variance, the plight of the owner is due to unique circumstances, and the variation will not alter the essential character of the locality. See also *LaSalle National Bank v. City of Highland Park*, 344 Ill. App. 3d 259, 269 (2003). The six additional factors above are then to be considered by the agency in determining whether a particular hardship exists. In its orders, the Board specifically found that plaintiff did not prove any of the three factors.

As noted above, plaintiff argues that the Board failed to make specific factual findings. Plaintiff argues that its two witnesses, Dietrich and Martinez, provided expert testimony that conclusively established each of the factors listed above. Furthermore, plaintiff argues that testimony from objectors at the hearing could not be accepted as expert testimony and, therefore, cannot overcome the expert testimony provided by Dietrich and Martinez.

While we agree with plaintiff that the Board did not provide much detail in its order, the fact remains that the ordinance only requires specific findings of fact when the Board grants a variance, an extraordinary action. In any event, though the Board denied the requested variances, it did make limited factual findings and specifically stated that none of the required factors had been proven. Plaintiff also correctly notes that the orders do not contain any credibility determinations. Inclusion of these two factors would have clearly assisted the circuit court, and this court, in assessing plaintiff's appeals. However, the statute does not require the Board to provide specific factual findings and its conclusions are supported by the record and that is all that is necessary to affirm.

1. Factor A: Reasonable Return

First, with respect to the reasonable return issue, plaintiff presented only the testimony of

Dietrich. Dietrich outlined the costs of purchasing the property and development of the project and concluded that he hoped to achieve a projected return of 8% to 12%. Plaintiff then argues that the costs of redesign and altering the present structure as it stands would significantly alter Dietrich's projections to the point of an unreasonable or losing return.

This argument cannot stand. The only reason costs would increase because of altering structures is because plaintiff began work without required building permits or variances. This certainly fits the consideration under subfactor (4) of the ordinance - that plaintiff brought financial hardship upon itself. Plaintiff purchased the property, commissioned the design of the project and began construction without proper permitting or variances to support the proposed design. This difficulty or hardship was created by a person having an interest in the property and cannot be considered evidence of a particular hardship.

James testified that if plaintiff had exercised proper due diligence, it would have discovered the issues at hand and been able to avoid any hardship. Again, James opined that different designs within the zoning regulations are possible and may return a financial gain. Plaintiff argues that James's testimony cannot contradict that of its expert Martinez. Plaintiff refers to James as a "landscaper," while the Board cites to James in its orders as an "architect." Both are technically correct in arguing the credibility of the witnesses. However, James submitted his resume to the Board and detailed his extensive experience working on urban planning issues.

Determinations as to the credibility and weight given to witnesses are strictly within the purview of the agency hearing the testimony. Although James is not a licensed architect and his drawings lacked detail, no testimony was offered to refute the viability of alternative designs that

13

did not violate the R5 zoning requirements. In fact, Martinez testified himself that a 74-unit development would fit within the R5 zoning regulations, but his 41-unit design would fit the community much better.

Plaintiff established that it would receive a reasonable return if its current proposal were allowed to continue, with the requested variances. The evidence presented by plaintiff does support the argument that it is not seeking variances purely to maximize profit from the property. James did provide testimony that plaintiff's plans maximize floor space; however, Martinez also testified that a less attractive building with 74 units would fit within the zoning regulations. However, this exact testimony also admits that other designs that would meet the R5 regulations would fit the space, and though less attractive, could be viable. Importantly, no evidence was presented that James's design or the design mentioned by Martinez could not achieve a reasonable return.

## 2. Factor B: Plight of the Owner

There is no doubt that plaintiff is correct in noting that the lot in question is unusual based on its triangle shape and the presence of a subway ventilation shaft. Consideration of additional ordinance factors also provides support for plaintiff. The configuration of this lot certainly leads to the conclusion that the conditions would not be applicable to other similarly zoned properties.

However, based on the record, we cannot say that the Board's findings that the plight of the owner was of its own making and that unique circumstances do not exist to require granting the variances are against the manifest weight of the evidence. Again, as noted above, at least a portion of plaintiff's plight was self-created. The fact that construction began before plaintiff

received building permits certainly weighs against its argument that its plight is unique and necessitates granting variances.

James testified that there are numerous similarly situated properties in Chicago such that the property at issue is not so unique as to require a variance. The Board has experience in reviewing countless requests such as this for properties throughout the City to determine the validity of James's testimony. Furthermore, though "unusual," the testimony with respect to a 2001 application and the alternative design presented by James provides support that the physical conditions of the property are more an inconvenience under the ordinance than purely unique.

### 3. Factor C: Effect on the Neighborhood

Plaintiff attempts to correlate the project that spurred the 2001 zoning change and proposed project as evidence that its project comports with the neighborhood's character and the desires of its residents. Plaintiff argues that the projects are the same and thus the neighborhood has already approved the project. However, the proposals are not identical, a fact that Commissioner McCabe-Miele pointed out at the hearing after she had reviewed the 2001 proposal. Furthermore, testimony was presented by Alderman Colon and other residents who objected to the instant project. The residents felt the project would not fit the neighborhood and would impair the supply of light and air to adjacent properties. The objectors also presented testimony and submitted exhibits to show that the project would not fit and would create public safety issues and increased congestion in the area.

Plaintiff did not rebut this testimony. Plaintiff argues that the municipal code only requires one parking spot per unit: thus, this is not an issue. However, this does not solve that issue. The

fact that the city only requires one parking spot does not eliminate the possibility that congestion would increase and the character of the neighborhood would be negatively affected.

With respect to Martinez's testimony to the effect on the property values of the neighborhood, the quote above highlights that nothing was proven by Martinez. Martinez did provide positive testimony regarding his design and his choices. He no doubt attempted to stay within the residential character of the neighborhood. However, outside of his design choices, Martinez did not offer substantive testimony regarding the ordinance factors.

Accordingly, based on the record, the Board's denial of plaintiff's appeal was not against the manifest weight of the evidence. Denial is proper if a petitioner fails to provide compelling evidence of any of the factors. The record supports denial of the appeal based on any of the three factors required under the ordinance.

### B. Bias Against Plaintiff

Plaintiff next argues that the Board, particularly Chairman Spingola, exhibited a bias against plaintiff. Review of a claim of bias on part of an administrative agency or official begins with the presumption that administrative officials are objective and capable of fairly judging an issue. *Waste Management of Illinois, Inc. v. Pollution Control Board*, 175 Ill. App. 3d 1023, 1040 (1988). Bias by an administrative agency may be shown only if a disinterested observer would conclude that the agency, or its members, had adjudged the facts and law of the case before the matter was heard. *Waste Management of Illinois, Inc.*, 175 Ill. App. 3d at 1040.

Defendant argues that plaintiff waived this issue. A party must promptly assert a claim of bias or partiality by an administrative agency upon knowledge of the alleged disqualification. *E &*

*E Hauling, Inc. v. Pollution Control Board*, 107 Ill. 2d 33, 38 (1985).  Otherwise, a party may be allowed to assert a bias claim only after receiving an unfavorable decision from an agency.  *North Avenue Properties*, 312 Ill. App. 3d at 187-88.  Plaintiff's claim centers solely on comments made by Spingola during the hearing, to which no objection was made.  Therefore, plaintiff waived this issue by failing to object or raise the issue at the hearing.

Waiver notwithstanding, plaintiff's argument fails on the merits.  The Board admittedly offers that Spingola was "perhaps cavalier" in his approach during the hearings.  We agree that Spingola was cavalier during the hearing.  He was very forthright in his opinion of the evidence presented at the hearing and, perhaps, too effusive in his statements about Alderman Colon.  However, the record indicates that Spingola's attitude was not so blunt, cavalier, or so deferential to the alderman that he must be considered biased.  Spingola appeared to be most concerned with moving the hearing along to make sure every party had an opportunity to present their side and not waste time on inconsequential testimony.  Most importantly, plaintiff was not prevented from fully presenting its argument.

An administrative official's public position or expressed strong views on an issue do not alone overcome the presumption of objectivity and capability.  *Waste Management of Illinois, Inc.*, 175 Ill. App. 3d at 1040.  Inherent in a hearing officer or judge's responsibilities is to decide which party presented stronger evidence, essentially developing a prejudice against one side.  As detailed above, plaintiff failed to present evidence on the relevant issues in this case.  Spingola's commentary on this when questioning James makes this clear.  Plaintiff was not denied an opportunity to present evidence and change Spingola's view.  Plaintiff's two planned witnesses

17

were heard, plaintiff's exhibits were accepted and reviewed, and plaintiff was given an opportunity to cross-examine witnesses and present closing arguments.

Spingola's comments in response to plaintiff's objections to Kaderbeck's testimony also fail to rise to the level of bias. Spingola properly noted that the zoning department had denied the application and that the building had to be torn down. Spingola's commentary that this would solve everyone's problem, i.e., for the building department and plaintiff because the structure had been damaged, and for the objectors because they did not approve of the project, were cavalier, but also true. They are not proof that he was biased or had prejudged plaintiff's appeal. Spingola was clearly upset that plaintiff was trying to remove its malfeasance from the hearing and he retorted that everyone's problem could be solved by tearing the building down.

Spingola's puffery that Alderman Colon was the "real expert" was merely an excessive show of respect. When he testified, Colon clarified that he was not a true expert. In any event, Spingola's statements were that Colon was the real expert who must "tie all of this together." That is exactly what Colon testified for, as the elected representative of the community to "tie together" the issues from his community.

Finally, plaintiff highlights Spingola's questions of Dietrich with respect to parking spaces as evidence that he was not concerned with the elements of a variance, but was biased. However, this view ignores factors (C) and (6) of the ordinance. If the proposed development did not include enough planned parking spaces to accommodate the increased population, it would likely impact the character of the neighborhood and congestion in the public streets. Spignola was simply eliciting an opinion on the effect on the neighborhood. The record and plaintiff's

allegations do not overcome the presumption that administrative officials are objective and capable of fairly judging issues before them.

### III.  CONCLUSION

Accordingly, for the aforementioned reasons, the decision of the trial court is affirmed.

Affirmed.

QUINN, P.J., and NEVILLE, J., concur.