2021 IL App (1st) 192528-U

THIRD DIVISION
May 19, 2021

No. 1-19-2528

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| SHEILA RYAN, | ) |
| | ) Appeal from |
| Plaintiff-Appellant, | ) the Circuit Court |
| | ) of Cook County |
| v. | ) |
| | ) 2016-CH-09800 |
| ZONING BOARD OF APPEALS OF THE CITY OF | ) |
| CHICAGO, RAYMOND T. DeGRAZIA, LAURA SHEEHAN, | ) Honorable |
| and 636-638 W. 37th STREET, INC., | ) Anna H. Demacopoulos, |
| | ) Judge Presiding |
| Defendants-Appellees. | ) |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

O R D E R

¶ 1    *Held*: Zoning Board of Appeals received ample relevant evidence and its findings and conclusion to grant variation sought by home builder and home buyer were consistent with the law and not against the manifest weight of the evidence.

¶ 2    This is a second appeal stemming from Sheila Ryan's opposition to the proximity of a home built adjacent to her long-term residence in 2015. In 2016, she sought administrative review of a variance granted by the Zoning Board of Appeals of the City of Chicago (Zoning Board) which reduced the new home's side setback from the shared property line from the standard two-foot minimum to 1.8 feet. *See* Chicago Municipal Code § 17-1-0100 *et seq*. (added May 26, 2004).

The defendants to Ryan's administrative action were the home's buyer, Laura Sheehan, the home's builder, Raymond T. DeGrazia, and DeGrazia's corporation, 636-638 W. 37th Street, Inc. However, the circuit court granted Sheehan's motion to dismiss Ryan's action due to a flawed summons. On appeal in 2018, we reversed and remanded for the circuit court to proceed. See *Ryan v. Zoning Board of Appeals*, 2018 IL App (1st) 172669, 116 N.E.3d 442. Ryan did not prevail on remand and now brings this appeal in which she contends the Zoning Board clearly erred in granting the variance to Sheehan and DeGrazia.

¶ 3     The circuit court entered a final order affirming the Zoning Board on November 14, 2019, and Ryan filed her notice of appeal on December 12, 2019. Accordingly, this court has jurisdiction over this matter pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017).

¶ 4     The following factual recitation is taken from the pleadings, exhibits, and testimony of record.

¶ 5     Ryan lives at 640 West 37th Street, in Chicago's Bridgeport neighborhood, in a one-story brick bungalow that was built more than 100 years ago on or near her east property line. The lot immediately to the east is 638 West 37th Street, which we will shorten to 638 West, and the next lot to the east is 636 West 37th Street, which we will shorten to 636 West. DeGrazia and/or his corporation purchased 638 West and 636 West in 2014 as the sites for a pair of new two-story residences. Each lot is roughly 25' wide by 109' long. Laura Sheehan and James Sheehan contracted in March 2015 to purchase 638 West and finance the construction of a home on the lot. The plans for 638 West complied with the requirement in the municipal zoning ordinance that for detached houses in areas zoned RS3 the "[c]ombined total width of [minimum] side setbacks must

equa1 20% of lot width with neither required setback less than 2 feet or 8% of lot width, whichever is greater." Chicago Municipal Ordinance, § 17-2-0309 (amended May 23, 2007). However, the concrete foundations for DeGrazia's two new residences were staked and poured in April 2015 in the wrong place. The Zoning Board conducted a hearing in April 2016 to determine whether Sheehan and the builder were entitled to variance for 638 West which reduced the setback by 2.5."

¶ 6    DeGrazia's nephew, Anthony DeGrazia, testified that he assisted with the construction and had instructed the concrete subcontractor to pour the foundation according to the plan. This would have situated the foundation two feet from the west property line, in conformance with the 2-foot minimum setback required of the RS3 zoned property on the north side of 37th Street. *See* Chicago Municipal Code § 17-2-0300 *et seq*. (amended Apr. 15, 2015) (zoning ordinance which limits the height of buildings and provides the minimum distances they must be "setback" from property boundaries on each side).

¶ 7    Anthony DeGrazia further testified that when the concrete contractor staked out the foundation, he measured only from the markers at the back of the lot, Ryan's home is "crooked" on her lot, and the front of the Ryan house angles closer to the Sheehan property. DeGrazia's surveyor, Eric Cox, testified that the new concrete foundation encroaches into the setback by 1.25 inches at the back of the property but by 2.5 inches at the front of the property. The proximity of the Ryan and Sheehan houses is further narrowed because Ryan's pitched roof encroaches into the setback by 1.5' (18") at the front of the property and by .9 feet (10.8") at the back of the property.

¶ 8    DeGrazia testified that it was not until after the walls and roof of the new home were in place that he was notified of the encroachment. Anthony DeGrazia also testified that he and his uncle were not notified of the encroachment until after the roof was in place. He added that in

September 2015, they took pictures of themselves standing on the roof of the home they were constructing and they got a letter from Ryan's attorney giving notice of the encroachment, and a letter asking that they either tear down the house or move its western wall. Tearing down one wall and rebuilding would have been more expensive than tearing down the entire house and rebuilding. The DeGrazias had already invested $400,000 in the construction, excluding the land cost. DeGrazia testified that at that point in time, the only feasible way to fix the "honest mistake" was to tear down the house and that under those circumstances, he could not receive "any reasonable economic return out of the project."

¶ 9        Ryan testified that shortly after the foundation was poured, she notified Anthony DeGrazia that it was within the setback. Ryan's nephew, William Boyle, who lives in the neighborhood and is a certified real estate appraiser with approximately 25 years' experience, stated that he measured and notified the project's general contractor that there was a problem within four or five days after the foundation was poured. Boyle further testified that the general contractor responded that Ryan's home went over her lot line and that Anthony DeGrazia subsequently showed him a survey which indicated that the placement of Ryan's home was the problem and that the new construction was not encroaching. Boyle opined to the board that 638 West sets a precedent that one can build on top of one's neighbors and that the new home does not allow for air flow and egress between the two properties. Anthony DeGrazia testified that when the foundation was poured, it was his understanding that Ryan was just generally upset that any house was being built in what had been vacant space toward the front of her property. The DeGrazias went to two meetings with Ryan and made what they thought was a reasonable offer to compensate her for the situation. Anthony DeGrazia thought the situation would be worked out "by being cordial." She neither accepted nor

counteroffered. The DeGrazias also went to a meeting with the building department which Ryan's attorney had requested, but the attorney did not show. Even after Ryan filed suit, Anthony DeGrazia tried to come to some sort of compromise with her. If the DeGrazias could simply move the foundation two inches, they would, as it made no difference to them where it was located and they were not advantaged by the "unfortunate" mistake that had been made.

¶ 10     Sheehan testified that she grew up in a house just around the corner from 638 West and now lives in the new home with her husband and two children. She contracted to purchase 638 West in March 2015, and in October 2015, prior to the January 2016 closing, she learned of Ryan's issue with the setback. By then, Sheehan's new home was "essentially done" and she was emotionally and financially invested in it. She had "custom designed" the interior by choosing all its finishes and the construction work had progressed to the point that the floors and cabinets were installed. Anthony DeGrazia testified that the construction was financed in part by Sheehan paying the subcontractors directly, and this was not an instance when a home buyer had simply put down a deposit which a builder could refund. A presale and Sheehan's investment in the construction began six months before construction started. Sheehan testified that if the home were taken down, it would be a hardship to lose the money, time, and effort she had given to the project. Selling the property was not an option either. Her request for a zoning variance was not motivated by a desire to make money. Because of her time in the neighborhood, she was familiar with its homes, commercial buildings, and the school and church which are across the street from her house. Her house has a similar style and is visually compatible with the other structures, despite being in the usual setback area. In addition, there are many houses in the neighborhood that do not allow for

gangway access between neighboring homes, including one in which some of her relatives live, which is right around the corner, at 36th and Lowe. Also, she did not cause the setback problem.

¶ 11     Certified real estate appraiser Hugh T. Edfors, MAI, J.D., testified on behalf of the variance applicants. Edfors' experience as a real estate appraiser dated to the early 1970s, he had also practiced as a real estate attorney in the 1980s, advised the Cook County Board of Review/Tax Appeals regarding property valuations in the 1990s, and was currently a principal in a firm that gives advice about real estate investments, valuation, and litigation in Chicago and other areas. Edfors said that the location of the house does not reduce the value of other homes in the neighborhood and does not reduce the value of Ryan's property. If Sheehan's house had been properly situated within the setback, it would not be more valuable. Sheehan's house fits in the character of the neighborhood and brings up the value of all the neighboring properties. The encroachment minimally reduces air and light to Ryan's home, and because of its low height (only two stories), it does not impair the adequacy of Ryan's air and light or ventilation.

¶ 12     Jose M. Torres testified as a fire safety expert. Torres had 36 years in fire service experience, multiple degrees in fire science, and since 2015 has served as the fire chief for the Village of Northbrook, Illinois. Torres testified that the requested variance did not increase the danger of fire nor would it make it more difficult for firefighters to fight fires between the two properties. Torres also testified that the variance would not endanger public safety. The written location report he prepared after a site visit on April 7, 2016 indicated that the "proximity of the structures to each other is typical in the City of Chicago and poses no extraordinary fire dangers or hazards."

¶ 13     Ryan's witnesses were limited to herself and her nephew, Boyle. However, George

Blakemore then testified as a "concerned citizen" regarding "an egregious act that has happened with no excuse." Blakemore suggested that it was good public policy for the Zoning Board to make the DeGrazias a "good example for others" by ordering them to tear down the construction.

¶ 14    At the close of the hearing, the Zoning Board took the matter under advisement. It subsequently issued a resolution regarding the application. In its 10-page decision, the board reviewed all the evidence presented. The board noted that its decision "must be based solely on the approval criteria enumerated in Section 17-13-1107-A, B and C of the Chicago Zoning Ordinance," and it examined that criteria and made specific findings as to each requirement.

¶ 15    First, pursuant to section 17-13-1107-A the board found that the applicants proved their case through testimony and other evidence indicating that "strict compliance with the regulations and standards of this Zoning Ordinance would create practical difficulties or particular hardships for the subject property because the home would need to be torn down." *See* Chicago Municipal Ordinance § 17-15-0404-A (amended Dec. 12, 2012). The board also found that the variation requested was "consistent with the stated purpose and intent of this Zoning Ordinance."

¶ 16    Second, in reviewing the section 17-13-1107-B requirements (*See* Chicago Municipal Code § 17-13-1107-B (amended Dec. 12, 2012)), the board found that the applicants proved the following through testimony and other evidence:

> "(1) the property in question cannot yield a reasonable rate of return if permitted to be used only in accordance with the standards of this Zoning Ordinance because the Applicants would need to either tear down the home or tear down the wall, both of which the Applicants cannot afford to do; and (2) the practical difficulty or particular hardship of the property–namely, the fact the home is already built in the setback–is due to the unique

circumstances of the foundation mistakenly being poured a few inches off and thus poured into the west side setback, and the mistake not being noticed until after the roof and walls of the home were up–and is not generally applicable to other similarly situated property; and (3) the variation, if granted, will not alter the essential character of the neighborhood as the homes in the neighborhood are built quite close together as testified to by Mr. Edfors, Ms. Sheehan and even Mrs. Ryan."

¶ 17    And, third, with respect to section 17-13-1107-C, the board determined that "a practical difficulty or particular hardship did exist," after taking into account: (1) the house already being built in the setback was a "particular topographical condition" that "would result in particular hardship upon the Applicants if the strict letter of the regulations were [now] carried out;" (2) the mistake in the foundation and the house built on it "are not applicable, generally, to other property in the RS-3 zoning district;" (3) given that Sheehan testified that she would have paid the same amount for the property if it had conformed with the setback, "the purpose for the variation is not based exclusively upon a desire to make more money out of the property;" (4) the mistake in the foundation and the house being built upon it were not created by anyone who had an interest in the property since neither applicant poured the foundation; (5) "the granting of the variation will not be detrimental to public welfare or injurious to other property as testified by Mr. Edfors;" and (6) the variance does not impair light or air to adjacent property, increase congestion in public streets, increase fire danger, endanger the public safely, or diminish or impair property values in the neighborhood. *See* Chicago Municipal Code § 17-13-1107-C (amended Dec. 12, 2012).

¶ 18    Then, having found that the applicants "sufficiently established by testimony and other evidence" needed for a variation pursuant to the three sections of the zoning ordinance, the board

resolved to approve the Sheehan and DeGrazia's request and authorized the variation.

¶ 19    Ryan sought administrative review in the circuit court of the board's decision. After the circuit court considered the record and the parties' written and oral arguments, the court upheld the board's resolution. This appeal followed.

¶ 20    The parties disagree about the applicable standard of review, as well as the soundness of the board's decision. Ryan contends it was clear error for the Zoning Board to grant the variance where the applicants' hardship was self-created, DeGrazia was "fully aware" of the encroachment but continued to build, and Sheehan chose to close on her real estate contract and move her family into the non-conforming home. Ryan also argues that granting a variance went "beyond the true purpose of the zoning ordinance" and that the ruling was not supported by sufficient affirmative evidence. Sheehan counters that the home's concrete foundation was mistakenly situated by the concrete subcontractor, rather than by the person who has a present interest in the property, and that Ryan's argument disregards unrebutted evidence in support of the board's decision. DeGrazia responds to Ryan that the manifest-weight-of-the-evidence standard, rather than the clear-error standard, governs; that Ryan misstates the record and argues for a reweighing of the evidence rather than the appropriate, deferential review; and that there is substantial evidence supporting the board's decision.

¶ 21    The findings and conclusions of an administrative agency on questions of fact are *prima facie* true and correct. *Kimball Dawson, LLC v. City of Chicago Dep't of Zoning*, 369 Ill. App. 3d 780, 786, 861 N.E.2d 216, 222 (2006) (citing 735 ILCS 5/3-110 (West 2004)).

¶ 22    Ryan has misconstrued *LaSalle National Bank v. City of Highland Park*, 344 Ill. App. 3d 259, 266, 799 N.E.2d 781, 787 (2003), to mean that we should employ the clear error standard in

our review of the presentation to the board and its ruling. In *LaSalle National Bank*, Highland Park property owners sought review of the local board's determination to deny a variance for the construction of a single-family home, and also challenged the trial court's dismissal of constitutional claims for failure to state a legally cognizable cause of action. *LaSalle National Bank*, 344 Ill. App. 3d 259, 799 N.E.2d 781. The appellate court addressed the first question under the manifest weight standard, rather than clear error. *LaSalle National Bank*, 344 Ill. App. 3d at 266, 799 N.E.2d at 787 ("[W]e find that the Board's determination *** was not against the manifest weight of the evidence. Accordingly, we must affirm the decision of the Board."). And it addressed the second question under the *de novo* standard, rather than clear error. *LaSalle National Bank*, 344 Ill. App. 3d at 270, 799 N.E.2d at 790 (reviewing dismissal of constitutional claims as "a question of law, which is reviewed *de novo*"). Only the first type of question is presented by Ryan's appeal. Furthermore, the relevance of the more deferential manifest weight standard is confirmed by the cases that DeGrazia cites regarding variance rulings. *See Hale v. First National Bank of Mount Prospect*, 57 Ill. App. 3d 310, 315, 372 N.E.2d 959, 962 (1978) (board's granting of variance authorizing subdivision of property in unincorporated Cook County "was not against the manifest weight of the evidence"); *Glaser v. City of Chicago*, 2018 IL App (1st) 171987, ¶ 24, 102 N.E.3d 770 (board's decision to grant zoning variations for home's height and rear setback "was not against the manifest weight of the evidence"); *Kimball Dawson*, 369 Ill. App. 3d at 790, 861 N.E.2d at 225 (board's denial of variances to yard size, setback requirements, and loading berth "was not against manifest weight of evidence"); and *Weinstein v. Zoning Board of Appeals of City of Highland Park*, 312 Ill. App. 3d 460, 465, 727 N.E.2d 655, 658 (2000) (board's determination to grant variances required for addition to home "was not against the manifest

weight of the evidence"). Thus, in this administrative review, our role will be to determine if the findings and decision of the Zoning Board are against the manifest weight of the evidence. *Kimball Dawson*, 369 Ill. App. 3d at 790, 861 N.E.2d at 225.

¶ 23     A determination is against the manifest weight of the evidence only if it can be said that all reasonable people would find that the opposite conclusion is clearly apparent. *Kimball Dawson*, 369 Ill. App. 3d at 786, 861 N.E.2d at 222. In making this determination, we do not weigh the evidence or substitute our judgment for that of the administrative agency. *Kimball Dawson*, 369 Ill. App. 3d at 786, 861 N.E.2d at 222; *O'Boyle v. Personnel Board*, 119 Ill. App. 3d 648, 653, 456 N.E.2d 998, 1002 (1983) (the agency is "charged with the primary responsibility of adjudication in [its] specialized area"). Reversal of the Zoning Board's decision is not justified even if the opposite conclusion is reasonable or because we might have ruled differently. *See Abrahamson v. Illinois Dep't of Professional Regulation*, 153 Ill. 2d 76, 88, 606 N.E.2d 1111, 1117 (1992); *Caliendo v. Martin*, 250 Ill. App. 3d 409, 416, 620 N.E.2d 1318, 1324 (1993). Instead, if there is evidence of record that supports the board's determination, it must be affirmed. *Kimball Dawson*, 369 Ill. App. 3d at 786, 861 N.E.2d at 222.

¶ 24     Ryan's primary argument is that the location of the concrete foundation does not meet the standard of section 17-13-1107-C(4) because it was a self-created hardship. She disagrees with the Zoning Board's finding that "the mistakenly poured foundation and the home built thereon were not created by any person having an interest in the subject property as the mistakenly poured foundation was not poured by either of the DeGrazias or Ms. Sheehan." Ryan contends this finding is contrary to the facts and law.

¶ 25    She misconstrues the record when she argues, "Instead of providing affirmative evidence, the Applicants repeatedly characterized the non-conforming construction into the setback as a 'mistake,' made apologies, and pleaded that the variation be granted so they do not lose the investments they made with full knowledge of the Setback Violation." As set out above and summarized by the Zoning Board, the testimony did not consist of mere apologies about the subcontractor's mistake and pleas that the board grant a variation. Rather, the applicants and their witnesses provided all the information that the board needed to resolve the variance request.

¶ 26    Ryan also misconstrues the ordinance. Section 17-13-1107-C(4) provides that when determining whether there is a practical difficulty or particular hardship, the Zoning Board may take into account whether the difficulty or hardship was created by any person presently having an interest in the property. The evidence before the board indicated that the encroachment into 638 West's setback was caused by the concrete subcontractor who poured the foundation after incorrectly staking its location. That individual did not have a present interest in the property. The only variance applicant with a present interest in the property was Sheehan and there was no evidence that she caused the foundation to be staked incorrectly or poured the concrete.

¶ 27    Ryan argues that the hardship was self-created because Sheehan knew about the setback issue when she closed on her purchase of the property and because Anthony DeGrazia "supervised" the concrete subcontractor. These aspects are not relevant to the standard stated in section 17-13-1107-C(4). Section 17-13-1107-C(4) only looks at whether the hardship was created by a person with a present interest in the property. Sheehan, the only person with a present interest in the subject property, did not pour the foundation and thus, she did not create the hardship. Furthermore, even if Sheehan's ability to back out of the real estate contract was relevant, Ryan

failed to elicit any testimony about the contract and the consequences of breaching it. Anthony DeGrazia testified that after Sheehan had entered into the contract, she paid "different contractors directly as earnest money that went towards the value of the house," and had invested over $80,000, "her life savings," into the home's completion. Ryan is suggesting that Sheehan should have breached the real estate contract, risked being sued by DeGrazia, and lost her investment in the home, instead of requesting a variance for a problem that she did not create. Ryan also erroneously states that Anthony DeGrazia was a variance applicant, an owner and operator of his uncle's corporation (636-638 W. 37th St.), and responsible for "his [concrete] subcontractor." Anthony DeGrazia was not a variance applicant. Furthermore, since there was no evidence that Anthony DeGrazia was a principal in the builder's corporation, it cannot be said that "his" concrete subcontractor made the mistake. Ryan's focus on Anthony DeGrazia does not help her appeal. We also reject Ryan's contention that the applicants' attorney admitted that the hardship was self-created. The hearing transcript which Ryan cites shows that counsel said the issue was caused by the concrete subcontractor:

> "CHAIRMAN SERCYE: Okay. Thank you, Counsel. All right. I'm going to open up the questions from the Board. I do want to start with this question. And, Counsel, this is for you, can you explain to me why this shouldn't be viewed as a self-created hardship? I mean, quite literally the house was created in violation of the code?
>
> MS. KURSON: Well, we have an applicant here who is the homeowner.
>
> CHAIRMAN SERCYE: Agreed.
>
> MS. KURSON: Who lives there with her family who is not a contractor who had a contract for the house.

- 13 -

CHAIRMAN SERCYE: Agreed. So let's set aside the homeowner. Not as to the homeowner, but as to the contractors?

MS. KURSON: As to the contractor this was a mistake by one of his subcontractors. And it was a mistake that he was testifying that he didn't find until September. So I guess that depends on how far you want to extend is this a problem of your own creation. He didn't pour the concrete. Right. And he didn't know until the roof was on."

Consistent with counsel's statement to the board, Sheehan, DeGrazia, and Anthony DeGrazia all testified that they did not pour the foundation. Ryan did not dispute this testimony.

¶ 28 Ryan erroneously relies on *Kimball Dawson* to support her claim that a self-created problem precluded the board from granting the variance. *Kimball Dawson*, 369 Ill. App. 3d 780, 861 N.E.2d 216. That case has no application here. In *Kimball Dawson*, an owner began constructing condominiums without building permits or variances on a project that he knew did not meet the zoning ordinance. *Kimball Dawson*, 369 Ill. App. 3d at 789, 861 N.E.2d at 224. There were alternative designs for the project that would have complied with the zoning ordinance and would have yielded a reasonable rate of return. *Kimball Dawson*, 369 Ill. App. 3d at 789, 861 N.E.2d at 224. The situation presented by 638 West is distinguishable in part because DeGrazia obtained a building permit prior to construction, demonstrating his intent to comply with the zoning ordinance, rather than flout it. The situation is also distinguishable because the building plans called for a home that was compliant with the zoning ordinance, but the foundation subcontractor made a mistake when following those plans. Similarly, *Asbach v. Zoning Board of Appeals of City of Chicago*, 133 Ill. App. 2d 22, 270 N.E.2d 535 (1971) and *Reichard v. Zoning Board of Appeals of City of Park Ridge*, 8 Ill. App. 3d 374, 290 N.E.2d 349 (1972), do not support

Ryan's claim that the hardship of the foundation being poured within the setback was self-created and should not have resulted in a variance. In both cases, the applicants knowingly paid more for properties than they were worth as zoned, with the expectation that they could obtain variances that would allow them to build what they wanted to build. After the buyer in *Asbach* paid about twice what the property was worth with the intention of erecting a factory so large that there could be no transitional yard, 20-foot setback, parking spaces, or loading dock, the board determined that the buyer had created his own alleged "hardship" and that his "inability to get a reasonable return is not based upon the burdensome effect of the zoning ordinance." *Asbach*, 133 Ill. App. 2d at 24, 270 N.E.2d at 536-37. In *Reichard*, the buyer also substantially overpaid with the intention of obtaining a variance that would permit construction of an 88-foot tall office building, in an area that was zoned for a maximum of only 40 feet. *Reichard*, 8 Ill. App. 3d at 380, 290 N.E.2d at 354. The fact that the buyer "paid more for the vacant lot than it was worth does not establish a hardship in relation to zoning." *Reichard*, 8 Ill. App. 3d at 381, 290 N.E.2d at 354. Here, 1) the hardship was not related to whether Sheehan would receive a reasonable rate of return, it was the incorrect placement of the concrete foundation; 2) the variation applicants did not make the mistake, it was the concrete subcontractor's error; and 3) the buyer did not contract for the property knowing that a variance was needed and that the value she paid was based on a variance being granted, rather, Sheehan did not know about the problem until after she had directly paid various subcontractors.

¶ 29    The record supports the board's finding that the encroaching foundation was not created by "any person having an interest in the subject property as the mistakenly poured foundation was not poured by either of the DeGrazias or Ms. Sheehan." The evidence presented is sufficient to

support the Zoning Board's ruling that the hardship was not self-created and met the requirements of section 17-13-1107-C(4).

¶ 30    Ryan next contends that the Zoning Board erred in finding there was sufficient affirmative evidence to support some of its findings. Ryan argues that there was no evidence that the purpose of the variation was not exclusively to make more money from the property (§ 17-13-1107-C(3)) and that there was no evidence that the particular physical surroundings, shape, or topographical condition of the property would result in a particular hardship upon the property owner if the zoning ordinance was enforced (§ 17-13-1107-C(1)). She contends Sheehan and DeGrazia did not meet their burden of providing affirmative evidence as to these requirements. This is another argument that disregards testimony in support of the variance application. Sheehan testified that she was not seeking the variance in order make money and she would have paid the same price if the house was built within the setback. Sheehan, DeGrazia, and Anthony DeGrazia all testified that the particular topographical condition of the property, *i.e.*, the house already being built, would result in a particular hardship upon Sheehan because tearing down the entire house or the west wall and rebuilding would be expensive and cost prohibitive. Ryan did not rebut this testimony supporting the board's determination that sections 17-13-1107-C(1) and (3) had been met.

¶ 31    Ryan also argues there was insufficient evidence to support the Zoning Board's finding that the applicants met the requirement of section 17-13-1107-B(1). That section requires a finding by the board based on evidence presented by the applicants that: "the property in question cannot yield a reasonable return if permitted to be used only in accordance with the standards of this Zoning Ordinance." Based on evidence presented by Sheehan and DeGrazia, the board found that 638 West "cannot yield a reasonable rate of return if permitted to be used only in accordance with

the standards of the Zoning Ordinance because the Applicants would need to either tear down the home or tear down the wall, both of which the Applicants cannot afford to do." Ryan contends it was improper for the Zoning Board to analyze the property's rate of return after the ordinance had been violated and that the board should have considered the rate of return without any violation. We disagree with her reading of the ordinance. Section 17-13-1107-B(1) states as its requisite finding that the property "*cannot* yield a reasonable return" (emphasis supplied), meaning in its current state, not that the property in question "did not" yield a reasonable return in its previous state prior to the home construction. This means that the board was to determine whether 638 West, as built and then forced to comply with the zoning ordinance, would yield a reasonable economic return. It was undisputed that in order to begin using the property in compliance with the ordinance, DeGrazia and Sheehan would have to either tear down the entire house or remove a wall and rebuild. DeGrazia and Sheehan's testimony established that if either solution were pursued, the property could not yield either of them a reasonable rate of return, and Sheehan added that she could not sell the property and receive a return. Ryan did not present any contrary evidence.

¶ 32     Moreover, despite Ryan's claims to the contrary, her interpretation of 17-13-1107-B(1) is not the interpretation used in *Kimball Dawson* and the material facts are not analogous. As discussed above, the applicant in *Kimball Dawson* claimed that he could not receive a reasonable rate of return unless granted a variation. Despite his claim, the record indicated that there were alternative designs that would comply with the zoning ordinance and yield a reasonable rate of return. *Kimball Dawson*, 369 Ill. App. 3d at 789, 861 N.E.2d at 224. The property at issue here could not have yielded a reasonable rate of return for either the builder or the home buyer/resident without a variance, because either the entire house or its west wall would have to be torn down

- 17 -

and rebuilt. There were also no alternative plans for the property. The only plan was for a new house to have been sited in compliance with the zoning ordinance, but a mistake was made in the execution of those plans. The ordinance and undisputed facts considered by the board support its finding that the property could not yield a reasonable rate of return if it had to be brought in compliance with the zoning standards.

¶ 33    Ryan also argues that the board erred in concluding there was sufficient evidence that the practical difficulty or particular hardship was attributable to unique circumstances. The board found that "the mistakenly poured foundation and home built thereon are not applicable, generally, to other property in the RS-3 zoning district." Section 17-13-1107-B(2) provides that in order to determine if a practical difficulty or particular hardship exists, the difficulty or hardship must be "due to unique circumstances" that "are not generally applicable to other similarly situated property." 17-13-1107-B(2). Ryan argues that the board erred because section 17-13-1107-B(2) cannot be satisfied by circumstances that the applicants created themselves when DeGrazia violated the ordinance during construction and Sheehan knowingly closed on the real estate contract months later. The evidence showed, however, as we discussed above, that a mistake rather than disregard of the ordinance created the situation. For this same reason, Ryan's citation to *Kimball Dawson*, yet again, is still unpersuasive. She argues that the land at issue in *Kimball Dawson* was unique in that it was triangular and included a subway ventilation shaft, and that, nevertheless, the board denied a variance because "at least a portion of the [owner's] plight was self-created" when he began non-conforming construction. *Kimball Dawson*, 369 Ill. App. 3d at 790-91, 861 N.E.2d at 225. However, neither section 17-13-1107-B(2) nor *Kimball Dawson* indicate that unique circumstances are limited to inherent physical characteristics of the land, and

the obvious difference between 638 West and *Kimball Dawson* is that the circumstances occurred by mistake rather than deliberate disregard. Ryan's argument regarding the facts and law is unpersuasive.

¶ 34     Finally, we consider Ryan's argument that the board misapplied 17-13-1107-A(2), which requires that the "requested variance is consistent with the stated purpose and intent of this Zoning Ordinance (*See* Sec. 17-1-0500)." § 17-13-1107-A(2). The relevant stated purposes of the zoning ordinance include "promoting the public health, safety and general welfare" (§ 17-1-1501), "preserving the overall quality of life for residents and visitors" (§ 17-1-0502), "protecting the character of established residential neighborhoods" (§ 17-1-0503), "maintaining orderly and compatible land use and development patterns" (§ 17-1-0508), "ensuring adequate light, air, privacy, and access to property" (§ 17-1-0509), "maintaining a range of housing choices and options" (§ 17-1-0512), and "accommodating growth and development that complies with the preceding stated purposes" (§ 17-1-0514). Nothing in the ordinance indicates that every one of these purposes must be accommodated by a single variance.

¶ 35     Ryan does not specify which of the various purposes was not furthered by the variance at issue. Illogically, she contends that this variance cannot be justified unless one of the stated purposes of the zoning ordinance was granting variances to the zoning ordinance. In any event, the variance is consistent with many of considerations that are listed. As a Chicago resident, Sheehan's overall quality of life was preserved in that she can reside in a home which she testified is located around the corner from where she grew up. The variance protects the character of the established residential neighborhood of Bridgeport, because real estate appraiser Edfors and Sheehan testified that the home is visually consistent with the surrounding homes. There is orderly

and compatible land use and development patterns as a single-family home was constructed in a residential area. The variance ensures adequate light, air, and access to Sheehan's property. As for Ryan's property, despite her objection to the proximity of the new construction, Edfors opined that there is no impairment to the adequacy of the air and light or ventilation to Ryan's property and fire safety expert Torres opined that the variance would not impair firefighters' access to either property. Lastly, with the variance, Sheehan's house helps maintain a range of housing choices and options, as well as accommodate growth and development, as the lot it was built upon had been vacant for some time and Edfors testified that Bridgeport is revitalizing with new construction of its residential and commercial buildings. The record indicates the variance is consistent with the purpose of the zoning ordinance.

¶ 36    Moreover, although Ryan contends that the requested variance was not consistent with the Zoning Ordinance, she fails to identify any portion of section 17-1-0500 that the board disregarded in its analysis or specify where the applicants' evidence was insufficient. She insists that a variance cannot be granted to address a construction mistake because the board can act only "*before any non-compliant work is done*." This statement is unsupported and ignores the reality that mistakes do occasionally occur on construction projects. She also argues that the Zoning Board "ben[t] the Zoning Ordinance" to remedy a mistake. She contends the variance at issue fosters a culture in which owners will disregard the zoning ordinance and "seek forgiveness later, rather than permission up front," and that this is reason alone to reverse the board. Ryan, however, disregards ordinance language requiring that a hardship not be self-created. *See* Chicago Municipal Ordinance § 17-13-1107-C(4) (indicating that when determining whether there is a practical difficulty or particular hardship, the Zoning Board may take into account whether the difficulty or hardship was

created by any person presently having an interest in the property). Furthermore, *South Side* is dissimilar and should not be cited for the proposition that a pre-existing violation precludes a variance. *South Side Move of God Church v. Zoning Board of Appeals*, 47 Ill. App. 3d 723, 365 N.E.2d 118 (1977). In *South Side*, the variance applicant purchased property in a C2-2 General Commercial zoned district with the intention of operating a church. *South Side*, 47 Ill. App. 3d at 725, 365 N.E.2d at 119. Churches are not permitted in C2-2 districts, unless a special use variance is granted. *South Side*, 47 Ill. App. 3d at 725, 365 N.E.2d at 119. The Zoning Board took into account that the special use applicant was already using the property as a church, but because the owner failed to prove the ordinance requirements, the board denied the application. *South Side*, 47 Ill. App. 3d at 725, 365 N.E.2d at 119. The denial was not based on there being a pre-existing violation. In contrast, Sheehan did not purchase 638 West with the intention of later seeking a variance. She had already signed a contract and paid various subcontractors before she knew a variance was needed. Also, Sheehan and DeGrazia proved all the variance requirements and the *South Side* applicant did not. *South Side* therefore does not support Ryan's argument. Nothing in the ordinance or precedent precludes a variation application to address a construction mistake or prevents the board from granting that type of request. The board did not "bend" the ordinance for Sheehan and DeGrazia. If an owner meets the numerous requirements set out in the Zoning Ordinance, the board may grant a variance, and if an owner does not meet the requirements, then the variance request will be denied, as was the case in *Kimball Dawson*.

¶ 37    Here, there was more than sufficient evidence before the Zoning Board to support its findings and the requested variation was consistent with the Zoning Ordinance. Accordingly, we hold that Zoning Board's decision to grant the variation to Sheehan and DeGrazia was not against

the manifest weight of the evidence and we affirm the Zoning Board's decision.

¶ 38    Affirmed.